PONTCHARTRAIN RAILROAD COMPANY *v.* THE NEW ORLEANS AND CARROLLTON BAILROAD COMPANY AND LAKE PONTCHARTRAIN RAILWAY COMPANY.

The Pontchartrain Railroad Company was incorporated in 1830, with the exclusive privilege of "constructing and using a railroad, or railway, leading to and from the city of New Orleans, its faubourgs, and the incorporated limits thereof, to and from Lake Pontchartrain," etc. In 1838 the New Orleans and Carrollton Railroad Company was incorporated for the construction of a railroad from New Orleans to Carrollton. In 1840 the Jefferson and Lake Pontchartrain Railway Company was incorporated for the construction of a railroad from Carrollton to Lake Pontchartrain. The two last named companies entered into an arrangement by which "through" trains were run from New Orleans to the Lake. The first named company (the plaintiffs) sued out an injunction against the defendants, and asked for damages, because of the alleged violation of the exclusive privilege granted to plaintiffs. *By the Court:* A railroad from New Orleans direct to the terminus of the Jefferson and Lake Pontchartrain Railroad at the Lake would have been an infringement of the privileges granted to the plaintiffs by the act of incorporation. Does the connection of the two points, by means of the union of two roads by a circuitous route, change

PONTCH'TR'N R.R.
v.
CARROLLTON R. R.

the character of the Act. Here we think a distinction must be taken. If the object of the two companies was, in good faith, to accommodate different lines of travel and trade, and not to engross the same travel and trade which would naturally pass over plaintiff's road, it would doubtless be lawful, although occasionally a person might use first one road and then the other to arrive at the lake or city. For it is not so much the motives of the traveling public with which we have to do as it is the motives of the two companies. But if the union of the two roads was made for the purpose of transporting freight or passengers to and from the prohibited points, it is difficult to see on what ground the Act can be maintained. The Legislature could no more grant this power to two or more companies than it could grant the same to one.

Neither of the Acts incorporating defendants is unconstitutional in itself, because their roads were not within the prohibited points. But the moment they, by their union, connect these points by railroad, their act becomes unconstitutional (so far as it concerns the direct travel between the two points) as much so as would have been a single Act of incorporation and railroad for the like purpose.

APPEAL from the Second District Court of New Orleans, *Lea*, J. *Eustis* and *Goold & Stansbury*, for plaintiffs. *Benjamin, Bradford & Finney*, for defendants and appellants.

MERRICK, C. J. The Pontchartrain Railroad Company was incorporated by an Act of the Legislature, approved January 30th, 1830. It was, therefore, one of the earliest of the railroad experiments, which have since contributed so largely to develop the resources and increase the wealth of the United States.

The fifth section of the Act is in these words, viz:

"Be it further enacted, that the said corporation is hereby invested with all the rights and powers necessary for the construction and repair of a railroad from the city of New Orleans to some suitable point on Lake Pontchartrain, or bayou or other stream leading to said lake, not exceeding ninety feet wide, with as many sets of tracks as said company may deem proper; and they and their agents may enter upon, use and excavate any land which may be wanted for the site of said road, or the erection of warehouses or other works necessary or useful to said road, or for any other purpose necessary or useful in the construction or repair of said road or its works. And it is stipulated and agreed, that for and during twenty-five years from the passage of this Act the said corporation shall have the exclusive right and privilege of constructing and using a railroad or railway leading to and from the city of New Orleans, its faubourgs, and the incorporated limits thereof, to and from the Lake Pontchartrain; and during that period no other body corporate, or person or persons, shall make any similar road for the transportation of property between said city, its faubourgs, and the incorporated limits thereof, and said lake, or be invested with any similar privileges. And it shall and may be lawful for the said corporation to continue and extend the said railroad to any point within the said city of New Orleans, with the like rights and privileges; provided always, that said railroad be so constructed and made as not to prevent the use of or travelling in the streets; and provided also, that the said railroad shall not pass through any of the streets of said city without the consent of the Mayor, Aldermen and inhabitants of the city of New Orleans being first had and obtained. And if the said railroad shall not be commenced in two years from the passage of this Act, and shall not be finished in five years therefrom, then this Act shall be null and void."

The phraseology of this section is somewhat remarkable. The Legislature assumes at once the character of a contracting party as well as a lawgiver. It says: "And it is *stipulated and agreed* (not enacted) that for and during the

space of twenty-five years from the passage of this Act said corporation shall <span style="float:right">Pontoh'tr'n R.R.<br>*v.*<br>Carrollton R. R.</span> have the exclusive right and privilege of constructing and using a railroad or railway leading to and from the city of New Orleans, its faubourgs, and the incorporated limits thereof, to and from Lake Pontchartrain."

In 1833 the New Orleans and Carrollton Railroad Company was incorporated with "all the powers necessary for the construction and repair of a railroad from some point in the suburb St. Mary, through Nayades street to its termination in Livaudais, and from thence to a street named First street, on a plan made of the plantation formerly belonging to *Barthelmy Macarty*, and which plan is deposited in the office of *Greenbury R. Stringer*, and thence through said street to the river Mississippi." Hence it is seen that the termini of this road were one within the city, the other on the Mississippi river at Carrollton. No one pretends that this road in any manner interfered with the exclusive franchise previously granted to the plaintiff.

In 1840 the Legislature incorporated the Jefferson and Lake Pontchartrain Railway Company, with power to construct a railroad from Carrollton to some suitable point on Lake Pontchartrain, or bayou or other stream leading to the lake, with as many sets of tracks as might be deemed proper by the company.

It must be conceded that this second road connecting the Mississippi river and the town of Carrollton with the lake is no violation of the charter of the plaintiffs. It had its termination on the river, some miles above New Orleans, and the termination on the lake was, we suppose, about three miles from that of the plaintiffs' road.

The Jefferson and Lake Pontchartrain Railway was not completed until the 14th day of April, 1853, when the company commenced running the cars. The stock of this company is principally owned by the New Orleans and Carrollton Railroad Company, and the road was built with money furnished by the latter. Indeed the several directors of the Jefferson and Lake Pontchartrain Railway Company are also directors of the New Orleans and Carrollton Railroad Company, and the principal officers of the two companies, viz: the President, Secretary and Chief Engineer, are the same; the other engineers and subordinate officers being different in the two companies, and the books of account and pay-rolls of the two companies are kept distinct.

We attach, however, no importance to the fact that the companies have the same officers and directors, and sustain the relationship which they do to each other. We shall treat them, for the purpose of this controversy, as two distinct bodies.

On the 29th day of March, 1853, the two companies entered into an arrangement, by which they contracted with each other for the privilege of running "through" trains over both railroads, and regulating the amount to be paid by each company therefor.

On the 29th of June, 1853, the wharf at the lake-end of the Jefferson and Lake Pontchartrain Railroad having been completed, a tariff of charges for the transportation of passengers and freight to and from Tivoli Circle, in the city of New Orleans, and Lake Pontchartrain, was adopted for both companies and published. Notice was likewise given of the manner by which a connection was formed with the coast steamers, Creole and California, for the transportation of passengers across the lake and to and from the coast, and the public were informed that the boats would leave on the arrival of the trains one hour in advance of the usual hours of the Pontchartrain Railroad, from which point the same boats would leave as heretofore.

PONTCH'TR'N R.R.
    *v.*
CARROLLTON R. R.

The present action was instituted on the 4th of June, 1853, to restrain the defendants from transporting passengers and property to and from the lake, and to recover five thousand dollars for each month until the termination of this suit.

The judgment of the lower court decreed the injunction prayed for, and awarded to the plaintiff $12,000 damages.

The defendants appealed.

The difficulty of the case lies in the fact that the New Orleans and Carrollton Railroad Company and the Jefferson and Lake Pontchartrain Railroad Company, as separately incorporated, have the right generally to transport freight and passengers to and from their respective termini, and such transportation cannot be considered an infringement of the franchises of the plaintiffs. And the question arises, if the New Orleans and Carrollton Railroad Company have the right to transport freight and passengers to and from Carrollton and New Orleans, and if the Jefferson and Lake Pontchartrain Railway Company have the like right to transport freight and passengers to and from Carrollton and the lake, why may not the two combine, and forward freight and passengers by one continuous line of railroad directly from the city to the lake, or from the lake to the city?

The answer to this question decides the case.

Tivoli Circle is within the limits of New Orleans, as incorporated prior to 1830. A railroad from New Orleans direct to the termination of the Jefferson and Lake Pontchartrain Railroad on the lake would have been an infringement of the privileges granted to the plaintiff by the Act of incorporation, according to the decisions in the cases of *Pontchartrain Railroad Company* v. *The Lafayette and Pontchartrain Railroad Company*, 10 An.; *Same* v. *Ranney*, 15 L. R., 404. Does the connection of the two points by means of the union of two roads, by a circuitous route, change the character of the Act?

Here, we think, a distinction must be taken. If the object of the two companies was in good faith to accommodate different lines of travel and trade, and not to engross the same travel and trade which would naturally pass over plaintiffs' road, the union of the roads would doubtless be lawful, although occasionally a person might use first one road and then the other to arrive at the lake or city. For it is not so much the motives of the traveling public with which we have to do as it is the motives of the two companies.

But if the union of the two roads was made for the purpose of transporting freight or passengers to and from the prohibited points, it is difficult to see on what ground the Act can be maintained. The Legislature could no more grant this power to two or more companies than it could grant the same to one. If the Legislature could not have chartered a company, with power to build a railroad from Tivoli Circle, in New Orleans, by way of Carrollton, to the present terminus of defendants' road on the lake, for the purpose of transporting freight and passengers from those two points, it must follow that the two companies cannot lawfully unite for that purpose, for the privileges delegated cannot be greater than the right of the party delegating. If the Legislature had not the power to grant, the defendants cannot take the privileges claimed for them.

A careful examination of the second section of the Act of incorporation of the Pontchartrain Railroad Company, we think, can leave no reasonable doubt that the Legislature could not have granted this privilege claimed by defen-

dants to one or more companies. The Legislature had not only expressly
covenanted and *agreed* affirmatively that the Pontchartrain Railroad Company should have the *exclusive* right and privilege to construct and use a railroad to and from the city of New Orleans, its faubourgs, and the incorporated limits thereof, to and from the Lake Pontchartrain, for the period of twenty-five years, but also it assured the company that no other body corporate, person or persons, should make any similar road for the transportation of passengers or property to or from the city, its faubourgs, and the incorporated limits thereof, and said lake, or be invested with any similar privileges.

This language is free from all ambiguity, and placed it out of the power of the Legislature, during the twenty-five years, directly or indirectly to grant to any other company or persons the right of transporting persons and property from the city to the lake by railroad.

The reason why the two Acts of incorporation of the defendants are not unconstitutional in themselves is because neither of them had within its object the two prohibited points of termination. The moment they, by their union, connect those points by railroad their act becomes unconstitutional, as much so (so far as it concerns the direct travel between the two points) as would have been a single Act of incorporation and railroad for the like purpose.

It is no answer to this reasoning to say that the Pontchartrain Railroad Company could not have built their road over the same line. For, without stopping to inquire whether such a deviation from the direct line would or would not be within the spirit of plaintiffs' charter, it is a sufficient reply to say that the Legislature could not do indirectly what it could not do directly. It could not grant a similar franchise to another company by adding thereto some other privilege or imposing some further burden, which it had withheld from the Pontchartrain Railroad Company. Subterfuge and evasion do not become the character of a sovereign State, and it is not to be presumed for a moment that the Legislature intended to allow the union of the two railroads to the prejudice of the privileges conferred upon the Pontchartrain Railroad Company. This, we think, answers the principal objections of defendants.

But it is further objected that "the inhabitants of Jefferson have a right to go on the Carrollton road, and thence to the lake by railroad, because the charter of the Pontchartrain Railroad Company does not by its terms affect travel from Jefferson to the lake, but only from New Orleans to the lake. The court cannot, therefore, order a break without infringing on the right of the people of that parish."

All this may be conceded. If the New Orleans and Carrollton Railroad Company should choose to establish their depot and run their cars from a point in the parish of Jefferson to the lake, for the purpose of accommodating in good faith the trade of that particular locality, and not the city of New Orleans, there would be no question of their right so to do. The fallacy of the argument consists in the attempt to couple that which is unlawful with that which is lawful, and while the defendants had the right to run a continuous train for the accommodation of the parish of Jefferson and the lake, it had not the like right between the city of New Orleans and the same point.

It is said "the true test of the question is whether the plaintiffs and defendants are serving the public for the same line of travel. If the line of travel is entirely different, there is no interference, although passengers and freight

33

PONTCH'TR'N R.R.
v.
CARROLLTON R.R.

may thereby obtain a choice of routes." It is further said that "when a person desires to go to the lake shore of the parish of Jefferson, the plaintiffs cannot carry him there, do not offer to do so, nor can they be compelled to do so by their charter. Their privileges and duties are co-extensive. They cannot prevent a traveler from going there on defendants' line, at the same time that they refuse to take him there themselves."

When the Legislature granted to the Pontchartrain Railroad Company its charter, it knew that its terminations would be a single point upon the lake and a like point in the city of New Orleans, and that when these points were once connected by the contemplated railroad, that the company would be unable to transport passengers to any other points upon the lake or in the city. With this knowledge, the Legislature provided that no other body corporate, or person or persons, should establish a similar road between the city and the lake. Whilst, therefore, the Pontchartrain Railroad Company is bound to carry freight and passengers from a single point in the city to a like point on the lake, it has the right to prevent any other company from carrying freight and passengers between other points on the lake and the city by the express provisions of its charter.

This view which we have taken of the case is supported by the decision in the case of *The Boston and Lowell Railroad Corporation* v. *The Salem and Lowell Railroad Company et al.*, decided by the Supreme Court of Massachusetts.

The next question to be considered is that of damages.

On the one side it is contended that there is no sufficient evidence in the record to justify the conclusion of the lower court; on the other it is said that the plaintiffs have notified the defendants that they will claim of them the sum of five thousand dollars damages per month, so long as they violate their rights ; that the violation of plaintiffs' rights by the defendant is voluntary, and that so long as they choose to continue the wrong, they ought to pay the estimate the plaintiffs have put upon their own property. The reasoning of the plaintiffs may be applicable in cases of express contracts, but it does not apply to quasi offences or torts. The rule of damages is the amount of injury sustained by the plaintiffs according to the usual standard of estimation, and not according to the arbitrary estimate placed upon it by the plaintiffs. *Yarborough* v. *Nettles*, 7 An. 117.

Were this the only controversy between the parties, we might be disposed to suffer the liberal award of damages by the lower court to stand as a vindication of property. But as we are informed that other suits are pending for other portions of the time, and as this suit is not the only one for the so called vindication of property, we think that we ought to ascertain as nearly as practicable the real injury the plaintiffs have suffered by the wrongful acts of the defendants, particularly as the exclusive privilege granted the Pontchartrain Railroad Company seems to have expired by limitation on the 26th day of January, 1855, and an estimate of damages in the several suits, from the commencement of the running of the cars until the expiration of the exclusive privilege, will make good to the plaintiffs all losses it has sustained. The twenty-five years of the charter having expired, there is no future to be protected. This suit covers the period from the commencement of the running of the cars, April 14th, 1853, to the rendition of judgment, July 1st, 1854.

An accurate estimate of the damages is impossible.  It was in the power of PONTCH'TR'N R.R. *v.* the defendants alone to have furnished us with more satisfactory proof.  The CARROLLTON R.R. defendants, having invaded the rights of the plaintiffs, and failing to furnish us with any statement of the travel through ·between the city and the lake, must be content with the conclusions to which we are able to arrive from such evidence as has been produced.

We find that the profit of the Pontchartrain Railroad Company increased notwithstanding the violation of their franchise by the defendants.  We find further that notwithstanding all of this alleged diverted travel and trade must have passed over the Jefferson and Pontchartrain Railroad, that the road did not pay expenses.

The gross receipts of this last mentioned railroad for ten months were $17,833 45.  We do not find that any tariff of charges through was adopted until 29th of June, 1853, about one year previous to the judgment in this case.  The first publication in the Picayune, in evidence, bears the same date.  We will assume that the previous period was equal to one entire month afterwards.  This would make the total gross receipts during thirteen full months $22,291 54.  But the thickly-settled country above the city, the town of Carrollton, and some travel from the Mississippi river, were also accommodated.  In the absence of any other data, we must divide the sum to ascertain the travel through from New Orleans.  We have $11,145 77 gross receipts.  But, as already said, we find the profits of the Pontchartrain Company did not fall off in the mean time; we conclude, therefore, that the novelty and convenience of the road induced many persons to travel upon it who would not have traversed the city to travel upon the Pontchartrain Railroad.

If we again divide the above sum by two, we have $5572 88, which we may suppose was diverted from the Pontchartrain Railroad Company.  The Jefferson and Pontchartrain Railroad Company received only two-fifths of the proceeds of this trade and travel: the whole sum therefore received by the two companies was $13,932 20.  But it must have cost the Pontchartrain Railroad Company something to transport the passengers and freight in addition to the cost of running their locomotive: we will suppose one-third.  We have an approximate loss of $9,288 sustained by the plaintiffs.  A judgment for nine thousand dollars, we think, will do justice as near as practicable between these parties.

It is, therefore, ordered, adjudged and decreed, that the judgment of the lower court be amended so as to read " nine thousand dollars as damages," instead of "twelve thousand dollars as damages," and that the judgment so amended be affirmed, the plaintiffs to pay the cost of the appeal.

SPOFFORD, J., dissenting.  I concur in the affirmance of the decree so far as it maintains the injunction, but I am unable to agree in the estimate of damages.

Under the circumstances, I do not think anything beyond the actual damages should be awarded.  The plaintiffs should have produced more complete data to enable us to fix these damages with a reasonable degree of certainty.  In the absence of such data, I am unwilling to resort to conjecture, and therefore think the damages should be nominal.

Rehearing refused.