NEW ORLEANS GAS COMPANY *v.* LOUISIANA
LIGHT COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF LOUISIANA.

Argued March 27, 30, 1885.—Decided December 7, 1885.

A gas company incorporated in 1835, with the exclusive privilege of making and selling gas in New Orleans, its faubourgs and Lafayette, up to April 1, 1875, and another gas company incorporated in 1870, with a like exclusive privilege in New Orleans on and after that day, could, just before that day, consolidate under the provisions of the act of December 12, 1874, of the legislature of Louisiana, which provided that "any two business or manufacturing companies now existing, whose objects and business are in general of the same nature, may amalgamate, unite and consolidate."

A legislative grant of an exclusive right to supply gas to a municipality and its inhabitants, through pipes and mains laid in the public streets, and upon condition of the performance of the service by the grantee, is a grant of a franchise vested in the State, in consideration of the performance of a public service, and, after performance by the grantee, is a contract protected by the Constitution of the United States against State legislation to impair it.

In granting the exclusive franchise to supply gas to a municipality and its inhabitants, a State legislature does not part with the police power and duty of protecting the public health, the public morals and the public safety, as one or the other may be affected by the exercise of that franchise by the grantee.

The prohibition in the Constitution of the United States against the passage of laws impairing the obligation of contracts applies to the Constitution, as well as the laws, of each State.

The Louisiana Light and Heat Producing and Manufacturing Company, a corporation of Louisiana, was organized in the year 1881, by H. S. Jackson, W. Van Benthusen, and their associates, under a general law providing for the formation of corporations for certain purposes, among which are the construction and maintenance of works for supplying cities or towns with gas. These associates and their successors, transferees, and assigns, had previously been authorized, by an ordinance of the common council of New Orleans passed January 25, 1881, for the period of fifty years, and upon specified conditions, to lay mains, pipes, and conduits in the streets, alleys,

sidewalks, bridges, avenues, parks, gardens, and other places in that city, for the purpose of supplying the public with gas. Among the conditions was one to the effect that the rights and privileges defined in the ordinance were granted and accepted without liability upon the part of the city to any other gas company to which franchises had been granted by legislative enactment. The consideration to be paid for these privileges was the sum of $20,000.

The benefit of this municipal grant having been transferred to the Louisiana Light and Heat Producing and Manufacturing Company, and that corporation being about to proceed with the construction of its mains, pipes, and conduits, the present suit was commenced against it and its directors in the Civil District Court of the Parish of New Orleans, by the New Orleans Gas-Light Company, which had been created, as will be presently explained, by the consolidation of other corporations. The plaintiff claimed to be entitled, for the term of fifty years from April 1, 1875, to the sole and exclusive privilege of manufacturing and distributing gas in that city by means of pipes, mains, and conduits laid in its streets, to such persons or corporate bodies as might choose to contract for the same. The relief asked was a decree perpetually enjoining defendant from digging up the streets, and other public ways or places of the city for the purpose of laying pipes, conduits, or mains for supplying illuminating gas, and from asserting any right to do so until after the lapse of fifty years from the latter date.

An application for an injunction having been denied, the suit was thereafter removed by the plaintiff into the Circuit Court of the United States, upon the ground that it was one arising under the Constitution of the United States. In the latter court a bill was filed, so as to conform to the general rules of equity practice.

A statement of the history of the corporations concerned in the before-mentioned consolidation is necessary to a clear understanding as well of the grounds upon which the court below proceeded, as of the questions argued in this court.

By an act of the legislature of Louisiana, passed April 1,

1835, the New Orleans Gas-Light and Banking Company was incorporated and was given "the sole and exclusive privilege of vending gas-lights in the city of New Orleans and its faubourgs and the city of Lafayette, to such persons or bodies corporate who may voluntarily choose to contract for the same;" to which end it was authorized to lay pipes or conduits at its own expense in any of the public ways or streets of those localities, having due regard to the public convenience. The right was reserved to the city, after the expiration of forty years, to buy such gas-works as the company constructed, and pay for the same in city bonds. If the city declined to purchase, then its bonds, which the company had received in payment of its subscription of stock, were to be renewed for twenty years.

By amendments of its charter made in 1845 and 1854, the company's right to engage in banking, was, by its consent, withdrawn, and the remaining rights granted by the original act were continued to the corporation under the name of the New Orleans Gas-Light Company, to be enjoyed until April 1, 1875, when its corporate privileges were to expire. This change was made subject to the condition that the company should assume all the debts and engagements of the original company, release its claims against the Charity Hospital, and, during the continuance of its charter, furnish that institution with necessary gas and fixtures free of charge. By amendments made in 1860 its charter was extended to April 1, 1895, the exclusive privileges granted by the original charter not, however, to exist beyond the time fixed in the act of incorporation.

By an act approved April 20, 1870, another company, under the name of the Crescent City Gas-Light Company, was incorporated. The charter provided that that company, its successors and assigns, should, for fifty years from the expiration of the charter of the New Orleans Gas-Light Company, have the sole and exclusive privilege of making and supplying gas-lights in the city of New Orleans, by means of pipes or conduits laid in the streets, to such persons or bodies corporate as might voluntarily choose to contract for it. By a subsequent enactment, in 1873, it was given authority to issue bonds

to an amount not exceeding $1,000,000, secured by mortgage of its works and property; and it was declared that the charter of the New Orleans Gas-Light Company should expire on April 1, 1875, from which latter date, and for the term fixed in the act of 1870, the franchise and privileges granted to the Crescent City Gas-Light Company were confirmed.

By a judgment rendered February 1, 1875, in a suit brought by the Crescent City Gas-Light Company against the New Orleans Gas-Light Company, and which involved their respective rights to manufacture and sell gas in New Orleans, the Supreme Court of the State held, that the former company "has the sole and exclusive privilege to make and sell illuminating gas in the city of New Orleans for fifty years from 1st April, 1875;" also, that the act of March 1, 1860, extending the charter of the New Orleans Gas-Light Company from April 1, 1875, until April 1, 1895, "is unconstitutional and void," as having a title that did not declare the object of the act. The latter company was also enjoined from conducting business after April 1, 1875, while the other company was confirmed in its exclusive right, after that date, to manufacture and distribute gas in New Orleans. *Crescent City Gas-Light Co.* v. *New Orleans Gas-Light Co.*, 27 La. Ann. 138.

The bill set out the foregoing facts, and alleged that during February and March, 1875, the directors of the two companies, by means of conferences with each other and with their respective stockholders, concluded to consolidate the two corporations under the name of the New Orleans Gas-Light Company, which should hold and enjoy the rights, privileges, franchises, and property of each; that they determined the amount of its capital, the number of directors, and the persons to compose a board before an election; that the two boards made an agreement, in writing, to which the owners of all the stock of either company had assented; that there had been no contestation by any stockholder of either of the two corporations of the consolidation or consolidation agreement; that "there was a formal vote, comprising more than three-fifths of all owners of stock, ratifying and confirming the articles, and the agreement and certificate of consolidation

have been filed and recorded in the office of the secretary of state;" that "the corporation thus organized and conducting business, from the 29th of March, 1875, has manufactured and sold gas throughout New Orleans without question or opposition," supplying the city, its officers, the officers of the State, and the public generally, and collecting its monthly bills; that there had been no suit by the State or the city questioning its capacity as a corporation, or its title to all the franchises, privileges, rights, or property in its possession; that its possession of "the sole and exclusive right aforesaid has existed from the agreement of the 29th of March, 1875;" that the State regularly assessed the property of the corporation and its franchise for taxation, and compelled it by suit to pay such taxes on property amounting to $3,750,000, of which the franchise was charged to be worth $1,250,000; and that the city of New Orleans, in like manner, assessed the consolidated company, and required from it the performance of the obligations of its charter in supplying gas throughout the city and on the public streets and in public buildings ever since the before-mentioned consolidation.

The defendants filed a demurrer and plea to the bill. The case was determined upon the demurrer, which was sustained and the bill dismissed, without any mention being made of the plea.

The Circuit Court was of opinion that the consolidation was entirely without legal authority, and, consequently, that there was, in law, no such corporation as the one which instituted this suit. Upon that ground alone the bill was dismissed.

*Mr. John A. Campbell* and *Mr. William D. Shipman* for appellant.

*Mr. E. Howard McCaleb* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court. After stating the facts in the language above reported, he continued:

The effect of the consolidation of March 29, 1875, is the first question to be considered.

By an act of the General Assembly of Louisiana of December 12, 1874, and entitled "An Act to authorize the consolidation of business or manufacturing corporations or companies," it is provided : " That any two business and manufacturing corporations or companies now existing under general or special law, whose objects and business are in general of the same nature, may amalgamate, unite, and consolidate said corporations or companies, and form one consolidated company, holding and enjoying all the rights, privileges, powers, franchises, and property belonging to each, and under such corporate name as they may adopt or agree upon. Such consolidation shall be made by agreement in writing, by or under the authority of the board of directors, and the assent of the owners of at least three-fifths of the capital stock of each of said corporations or companies, and a certificate of the fact of such consolidation, with the name of the consolidated company, shall be filed and recorded in the office of the secretary of state : *Provided*, no such consolidation shall in any manner affect or impair the right of any creditors of either of said companies. In the agreement of consolidation the number of directors of the consolidated company shall be specified, and the capital stock may be any amount agreed upon by the companies or corporations, and set forth in the articles of consolidation."

It will be observed that a consolidated company formed under this act acquires all the rights, privileges, and franchises possessed by its constituent companies.

It is contended—and such was the view taken by the Circuit Court—that, as the original New Orleans Gas-Light Company had, until April 1, 1875, the exclusive right to manufacture, and distribute gas in New Orleans, and as the like exclusive right of the Crescent City Gas-Light Company did not come into existence until that day, the latter was not, when the act of 1874 was passed, an " existing " business or manufacturing corporation entitled to the privilege of consolidating with another company.

In this interpretation of the statute we do not concur. The original and amended charters of the Crescent City Gas-Light Company invested it with powers of an important character,

capable of being effectively exerted prior to the passage of the general statute of 1874. By the act of April 20, 1870, it was authorized, after its passage, to lay pipes or conduits in any of the streets or alleys of the city of New Orleans. Upon its organization, it was entitled to acquire and hold property for all the objects of its creation, to construct works, purchase machinery, provide materials, and make such preparations as were required to put it in readiness to enjoy the exclusive privilege, of supplying the city and its inhabitants with gas on and after April 1, 1875. After its incorporation it could have made contracts, obtained capital, and raised money upon bonds secured by mortgage of its works and property then or thereafter acquired. At the passage of the consolidation act it was entitled to exert the powers given by its charter except that it could not, before April 1, 1875, encroach upon the exclusive privileges granted to the other company. With the consent of the latter company, it could, even prior to that date, have manufactured and sold gas to the city and to its inhabitants; for, as declared in the Civil Code of Louisiana (Art. 11), "in all cases in which it is not expressly or impliedly prohibited, they [individuals] can renounce what the law has established in their favor, when the renunciation does not affect the rights of others, and is not contrary to the public good." Without such consent, the Crescent City Gas-Light Company could after its organization have engaged in the manufacture and distribution of gas in those parts or districts of New Orleans not included in the charter of the old company. *Pontchartrain Railroad Co.* v. *Lafayette & Pontchartrain Railroad Co.*, 10 La. Ann. 741. For these reasons, we are of opinion that, on the passage of the act of 1874, and, within a reasonable interpretation of its language, the Crescent City Gas-Light Company was an "existing" business or manufacturing corporation, entitled to "amalgamate, unite, and consolidate" with any like corporation having objects and business in general of the same nature. In so holding, it is not perceived that violence is done to any considerations of public policy which could be supposed to have prompted the act of 1874, or the legislation relating to the two companies.

These views give effect to the decision of the Supreme Court of the State in *Fee* v. *The New Orleans Gas-Light Company*, 35 La. Ann. 413, which was determined after the decree in the Circuit Court had been passed. One of the questions related to Fee's rights in the consolidated company by virtue of his ownership of stock in the Crescent City Gas-Light Company. The report of that case shows that the articles of consolidation were before the court, and that their legal effect was considered with reference to the provisions of the act of 1874. Mr. Justice Fenner, speaking for the court, said: "On the 29th of March, 1875, the New Orleans Gas-Light Company and the Crescent City Gas-Light Company, two corporations chartered under the laws of this State, amalgamated, united, and consolidated themselves into one consolidated company, in pursuance of the provisions of an act of the General Assembly, No. 157 of 1875, entitled 'An Act to authorize the consolidation of business or manufacturing corporations or companies.' . . . All requirements of the act were fully complied with. . . . The articles of consolidation, and the legislative act by the authority of which they were executed, evidently present a case of complete and perfect amalgamation, the effect of which was, under American authorities, to terminate the existence of the original corporations, to create a new corporation, to transmute the members of the former into members of the latter, and to operate a transfer of the property, rights, and liability of each old company to the new one. . . . These authorities, and the reason of the matter, satisfy us that plaintiff can and must look to the defendant-company for the satisfaction of whatever rights he had against the Crescent City Gas-Light Company, in the mode and on the terms provided in the articles of consolidation." Again: "The law conferred upon three-fifths of his fellow stockholders the power to effect a consolidation without his consent, and even against his will, and he is bound by that consolidation and by the legal effects thereof, which we have heretofore stated." If the view taken by the Circuit Court be correct, then the consolidation between these companies could not, as adjudged by the Supreme Court of Loui-

siana, have affected Fee's rights, and compelled him to look to the consolidated company for the satisfaction of his claims as a stockholder in the Crescent City Gas-Light Company.

This brings us to the consideration of questions more difficult. It is contended that the right granted to the Crescent City Gas-Light Company, of manufacturing and distributing illuminating gas, and now enjoyed by the consolidated company, was abrogated, to the extent that it was made exclusive, by that article of the Constitution of Louisiana of 1879, which, while preserving rights, claims, and contracts then existing, provided that " the monopoly features in the charter of any corporation now existing in this State, save such as may be contained in the charter of railroad companies, are hereby abolished;" and, that such article is not in violation of the provision of the Constitution of the United States which forbids a State to pass a law impairing the obligation of contracts.

These propositions have received the careful consideration which their importance demands.

It is true, as suggested in argument, that the manufacture and distribution of illuminating gas, by means of pipes or conduits placed, under legislative authority, in the streets of a town or city, is a business of a public character. Under proper management, the business contributes very materially to the public convenience, while, in the absence of efficient supervision, it may disturb the comfort and endanger the health and property of the community. It also holds important relations to the public through the facilities furnished, by the lighting of streets with gas, for the detection and prevention of crime. An English historian, contrasting the London of his day with the London of the time when its streets, supplied only with oil lamps, were scenes of nightly robberies, says that " the adventurers in gas-lights did more for the prevention of crime than the government had done since the days of Alfred." Knight, vol. 7, ch. 21; Macaulay, ch. 3. Municipal corporations constitute a part of the civil government of the State, and their streets are highways, which it is the province of government by appropriate means to render safe. To that end the lighting of

streets is a matter of which the public may assume control. For these reasons, and the necessity of uniform regulations for the manufacture and distribution of gas for use by the community, we are of opinion that the supplying of it to the city of New Orleans, and to its inhabitants, by the means designated in the legislation of Louisiana, was an object for which the State could rightfully make provision. Authority for the position that the supplying of gas to a city and its people may become a public purpose is found in *New Orleans* v. *Clark*, 95 U. S. 644. That case involved the liability of a municipal corporation upon coupon bonds issued to a company which had undertaken, for a valuable consideration, to light its streets with gas. Mr. Justice Field, delivering the opinion of the court, said: "A private corporation, as well as individuals, may be employed by a city in the construction of works needed for the health, comfort, and convenience of its citizens; and though such works may be used by the corporation for its own gain, yet, as they advance the public good, the corporation may be properly aided in their construction by the city; and for that purpose its obligations may be issued, unless some constitutional or legislative provision stands in the way." p. 652. Legislation of that character is not liable to the objection that it is a mere monopoly, preventing citizens from engaging in an ordinary pursuit or business, open as of common right to all, upon terms of equality; for, the right to dig up the streets and other public ways of New Orleans, and place therein pipes and mains for the distribution of gas for public and private use, is a franchise, the privilege of exercising which could only be granted by the State, or by the municipal government of that city acting under legislative authority. Dillon's Municipal Corp., 3d Ed., § 691; *State* v. *Cincinnati Gas Co.*, 18 Ohio St. 262; see also *Boston* v. *Richardson*, 13 Allen, 146.

To the same effect is the decision of the Supreme Court of Louisiana in *Crescent City Gas-Light Co.* v. *New Orleans Gas-Light Co.*, 27 La. Ann. 138, 147, in which it was said: "The right to operate gas-works and to illuminate a city, is not an ancient or usual occupation of citizens generally. No one has

the right to dig up the streets, and lay down gas pipes, erect lamp posts, and carry on the business of lighting the streets and the houses of the city of New Orleans, without special authority from the sovereign. ' It is a franchise belonging to the State, and, in the exercise of the police power, the State could carry on the business itself or select one or several agents to do so."

It will therefore be assumed, in the further consideration of this case, that the charter of the Crescent City Gas-Light Company—to whose rights and franchises the present plaintiff has succeeded—so far as it created a corporation with authority to manufacture gas and to distribute the same by means of pipes, mains, and conduits, laid in the streets and other public ways of New Orleans, constituted, to use the language of this court in the case of the *Delaware Railroad Tax*, 18 Wall. 206, "a contract between the State and its corporators, and within the provision of the Constitution prohibiting legislation impairing the obligation of contracts," and therefore "equally protected from legislative interference, whether the public be interested in the exercise of its franchise, or the charter be granted for the sole benefit of its corporators." See also *Greenwood* v. *Freight Co.*, 105 U. S. 13, 20; *New Jersey* v. *Yard*, 95 U. S. 104, 113.

But it is earnestly insisted that, as the supplying of New Orleans and its inhabitants with gas has relation to the public comfort, and, in some sense, to the public health and the public safety, and, for that reason, is an object to which the police power extends, it was not competent for one legislature to limit or restrict the power of a subsequent legislature in respect to those subjects. It is, consequently, claimed that the State may at pleasure recall the grant of exclusive privileges to the plaintiff; and that no agreement by her, upon whatever consideration, in reference to a matter connected in any degree with the public comfort, the public health or the public safety, will constitute a contract the obligation of which is protected against impairment by the National Constitution. And this position is supposed by counsel to be justified by recent adjudications of this court in which the nature and scope of the police power have been considered.

In the *Slaughter-House Cases,* 16 Wall. 36, 62, it was said that the police power is, from its nature, incapable of any exact definition or limitation; and, in *Stone* v. *Mississippi,* 101 U. S. 814, 818, that it is "easier to determine whether a particular case comes within the general scope of the power than to give an abstract definition of the power itself, which will be in all respects accurate." That there is a power, sometimes called the police power, which has never been surrendered by the States, in virtue of which they may, within certain limits, control everything within their respective territories, and upon the proper exercise of which, under some circumstances, may depend the public health, the public morals, or the public safety, is conceded in all the cases. *Gibbons* v. *Ogden,* 9 Wheat. 1, 203. In its broadest sense, as sometimes defined, it includes all legislation and almost every function of civil government. *Barbier* v. *Connolly,* 113 U. S. 27, 31. As thus defined, we may, not improperly, refer to that power the authority of the State to create educational and charitable institutions, and provide for the establishment, maintenance, and control of public highways, turnpike roads, canals, wharves, ferries, and telegraph lines, and the draining of swamps. Definitions of the police power must, however, be taken, subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land.

Illustrations of interference with the rightful authority of the general government by State legislation which was defended upon the ground that it was enacted under the police power, are found in cases where enactments concerning the introduction of foreign paupers, convicts, and diseased persons, were held to be unconstitutional, as conflicting, by their necessary operation and effect, with the paramount authority of Congress to regulate commerce with foreign nations, and among the several States. In *Henderson &c.* v. *Mayor of New York,* 92 U. S. 259, the court, speaking by Mr. Justice Miller, while declining to decide whether in the absence of action by Congress, the States can, or how far they may, by appropriate legislation protect themselves against actual paupers, vagrants, criminals,

and diseased persons, arriving from foreign countries, said, that no definition of the police power, and "no urgency for its use can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution." p. 271. *Chy Lung* v. *Freeman*, 92 U. S. 275. And in *Railroad Co.* v. *Husen*, 95 U. S. 465, Mr. Justice Strong, delivering the opinion of the court, said that "the police power of a State cannot obstruct foreign commerce or inter-State commerce beyond the necessity for its exercise; and, under color of it, objects not within its scope cannot be secured at the expense of the protection afforded by the Federal Constitution." pp. 473–4.

That the police power, according to its largest definition, is restricted in its exercise by the National Constitution, is further shown by those cases in which grants of exclusive privileges respecting public highways and bridges over navigable streams have been sustained as contracts, the obligations of which are fully protected against impairment by State enactments.

In *Bridge Proprietors* v. *The Hoboken Co.*, 1 Wall. 116, it was decided that a statute of New Jersey empowering certain commissioners to contract for the building of a bridge over the Hackensack River, and providing not only that the "said contract should be valid on the parties contracting as well as on the State of New Jersey," but that it should not be lawful "for any person or persons whatsoever to erect any other bridge over or across the said river for ninety-nine years," was a contract whose obligation could not be impaired by a law of the State. Mr. Justice Miller, delivering the opinion of the court, after observing that the parties who built the bridges had the positive enactment of the legislature in the very statute which authorized the contract with them, that no other bridge should be built, and that the prohibition against the erection of other bridges was the necessary and only means of securing to them the benefit of their grant, said : "Without this they would not have invested their money in building the bridges, which were then much needed, and which could not have been built without some such security for a permanent and sufficient return for the capital so expended. On the faith of this enactment

they invested the money necessary to erect the bridges. These acts and promises, on the one side and the other, are wanting in no element necessary to constitute a contract." p. 146.

In *The Binghamton Bridge*, 3 Wall. 51, the question was, whether a charter granted to a company, authorizing it to build and maintain a bridge across a river in New York for the accommodation of the public, in consideration for which it was given a right to take certain tolls, and providing that it should be unlawful for any one to erect a bridge, or establish a ferry, within a distance of two miles on that river, either above or below that bridge, constituted a contract within the meaning of the Constitution. Under authority of a subsequent statute, another company erected a bridge across the same river, within a few rods above the old one, to the injury of the business of the latter. The argument was strenuously pressed that, while the legislature could dispose of all matters properly the subject of bargain, it had no authority to dispose of the right of passing a great river for four miles. The court held that the first company's charter was a contract between it and the State, within the protection of the Constitution of the United States, and that the charter to the last company was, therefore, null and void. Mr. Justice Davis, delivering the opinion of the court, said, that, if anything was settled by an unbroken chain of decisions in the Federal courts, it was, that an act of incorporation was a contract between the State and the stockholders, "a departure from which *now* would involve dangers to society that cannot be foreseen, would shock the sense of justice of the country, unhinge its business interests, and weaken, if not destroy, that respect which has always been felt for the judicial department of the government." p. 73. It was also observed, in language applicable to the present case, in some respects: "The purposes to be attained are generally beyond the ability of individual enterprise, and can only be accomplished through the aid of associated wealth. This will not be risked unless privileges are given and securities furnished in an act of incorporation. The wants of the public are often so imperative that a duty is imposed on the Government to provide for them; and, as ex-

perience has proved that a State should not directly attempt to do this, it is necessary to confer on others the faculty of doing what the sovereign power is unwilling to undertake. The legislature, therefore, says to public-spirited citizens: 'If you will embark, with your time, money, and skill, in an enterprise which will accommodate the public necessities, we will grant to you, for a limited period, or in perpetuity, privileges that will justify the expenditure of your money, and the employment of your time and skill.' Such a grant is a contract, with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it." See also *West River Bridge Co.* v. *Dix*, 6 How. 507, 531.

The same principle was declared by the Supreme Court of Louisiana in *Pontchartrain Railroad Co.* v. *Orleans Navigation Co.*, 15 La. Ann. 404, 413, where Chief Justice Martin said: "In the same manner as Congress may reward the discoverer of a new invention or mode of constructing roads, by an exclusive privilege, the legislature may reward those who employ their capital and industry in doubtful enterprises, for the construction of a railway between two points, which may be of great utility to the public, though the success of the enterprise may be precarious." See also *Pontchartrain Railroad Co.* v. *New Orleans Railway Co.*, 11 La. Ann. 253; *Pontchartrain Railroad Co.* v. *Lafayette & Pontchartrain Railroad Co.*, *ubi supra*. And in *Crescent City Gas-Light Co.* v. *New Orleans Gas-Light Co.*, the court said: "As the legislature had the right in 1835 to grant the sole and exclusive privilege to the defendant company to make and vend gas in New Orleans for forty years, the legislature of 1870 had the same power to confer on the plaintiff the same privilege for fifty years from the termination of the grant to defendant. We therefore, conclude that the grant of the monopoly complained of does not violate the Constitution and is valid."

Numerous other cases could be cited as establishing the doctrine that the State may by contract restrict the exercise of some of its most important powers. We particularly refer to those in which it is held that an exemption from taxation, for

a valuable consideration at the time advanced, or for services to be thereafter performed, constitutes a contract within the meaning of the Constitution. *Asylum* v. *New Orleans,* 105. U. S. 362, 368; *Home of the Friendless,* 8. Wall. 430; *New Jersey* v. *Wilson,* 7 Cranch, 164, 166; *State Bank of Ohio* v. *Knoop,* 16 How. 363, 376; *Gordon* v. *Appeal Tax Court,* 3 How. 133; *Wilmington Railroad* v. *Reid,* 13 Wall. 264, 266; *Humphrey* v. *Pegues,* 16 Wall. 244, 248–9; *Farrington* v. *Tennessee,* 95 U. S. 679, 689.

If the State can, by contract, restrict the exercise of her power to construct and maintain highways, bridges, and ferries, by granting to a particular corporation the exclusive right to construct and operate a railroad within certain lines and between given points, or to maintain a bridge or operate a ferry over one of her navigable streams within designated limits; if she may restrict the exercise of the power of taxation, by granting exemption from taxation to particular individuals and corporations; it is difficult to perceive upon what ground we can deny her authority—when not forbidden by her own organic law: —in consideration of money to be expended and important services to be rendered for the promotion of the public comfort, the public health, or the public safety, to grant a franchise, to be exercised exclusively by those who thus do for the public what the State might undertake to perform either herself or by subordinate municipal agencies.

The former adjudications of this court, upon which counsel mainly rely, do not declare any different doctrine, or justify the conclusion for which the defendant contends.

In *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 32, one of the questions considered was, whether the charter of a private corporation, authorizing it to engage in the manufacture of malt liquors, and, as incidental thereto, to dispose of the product, constituted a contract protected against subsequent legislation prohibiting the manufacture of liquors within the State. The Beer Company claimed the right, under its charter, to manufacture and sell beer without limit as to time, and without reference to any exigencies in the health or morals of the community requiring such manufacture to cease. It was decided

that, while the company acquired by its charter the capacity, as a corporation, to engage in the manufacture of malt liquors, its business was at all times subject to the same governmental control as like business conducted by individuals; and that the legislature could not divest itself of the power, by such appropriate means, applicable alike to corporations and individuals, as its discretion might devise, to protect the lives, health, and property of the people, or to preserve good order and the public morals. The prohibitory enactment of which the Beer Company complained was held to be a mere police regulation which the State could establish even had there been no reservation of authority to amend or repeal its charter.

The case of *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, 663, is much relied on by counsel. But a careful examination will show that it does not militate against the views here expressed. A fertilizing company, having been authorized by its charter to establish and maintain south of a specified line in Cook County, Illinois, chemical and other works for manufacturing and converting animal matter into an agricultural fertilizer and other chemical products, claimed that its charter constituted a contract the obligation of which was impaired by an ordinance of the village of Hyde Park, where its works were established, prohibiting under penalties the carrying of offal through its streets from Chicago to the company's place of business. The ordinance was based upon a statute passed after the date of the company's charter, investing the village authorities with power to define or abate nuisances injurious to the public health, and to regulate, prohibit, or license certain named trades or callings, and " all establishments and places where nauseous, offensive, or unwholesome business was carried on." It appeared in proof that the company's factory was " an unendurable nuisance to the inhabitants for many miles around its location; that the stench was intolerable, producing nausea, discomfort, if not sickness to the people; that it depreciated the value of the property, and was a source of immense annoyance;" and that the transportation of putrid animal matter by the company through the streets of Hyde Park " was offensive in a high degree both to sight and smell." The decision was, that

the State, under her power to protect the public health, could abate the nuisance created by the company's business notwithstanding its works had been established within the general locality designated in its charter, and, consequently, the legislature could, at its discretion, amend the charter of Hyde Park and remove the restriction upon its authority to abate nuisances, or invest it with power to regulate or prohibit business necessarily injurious to the public health.

The same principles underlie the decision in *Stone* v. *Mississippi*, 101 U. S. 814, in which it was held that any one accepting a grant of a lottery does so " with the implied understanding that the people, in their sovereign capacity and through their properly constituted agencies, may resume it at any time when the public good shall require, whether it be paid for or not," the only right acquired by the grantee being " a suspension of certain governmental rights in his favor, subject to withdrawal at will." The business, for the protection of which the contract clause of the Constitution was invoked, was declared by the court to be a species of gambling, wrong in its influence, and tending to " disturb the checks and balances of a well-ordered community." Touching legislation granting the privilege of engaging in business of that character, the Chief Justice, delivering the opinion of the court, said: " No legislature can bargain away the public health or the public morals. The people themselves cannot do it, much less their servants. The supervision of both these subjects of governmental power is continuing in its nature, and they are to be dealt with as the special exigencies of the moment may require. Government is organized with a view to their preservation, and cannot divest itself of the power to provide for them. For this purpose the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself." p. 819.

We are referred to *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746, as authority for the proposition that the State is incapable of making a contract protected by the National Constitution, in reference to any matter within the reach of her police power in its broadest sense. But no such principle is there established. In that case the question was whether

a grant in 1869 to a private corporation of the exclusive privilege of maintaining a live-stock landing and slaughter-house, within a certain part of the territory of Louisiana, embracing the city of New Orleans—all slaughtering by others in that city to be done at the establishment erected by that corporation—prevented the State, or the municipal government of the city, acting under her authority, from thereafter opening to general competition the right to maintain slaughter-houses and live-stock landings. The majority of the court, in the *Slaughter-House Cases*, having determined that the grant was merely a police regulation, designed to remove from the thickly populated part of New Orleans "noxious slaughter-houses and large and offensive collections of animals necessarily incident to the slaughtering business of a large city," and that the authority to do that rested upon the same ground as the power to interdict in the midst of dense populations unwholesome trades, operations offensive to the senses, building with combustible materials, and the burial of the dead, it was ruled in the last case that the obligations of a contract could not arise out of such a police regulation. So far from the court saying that the State could not make a valid contract in reference to any matter whatever within the reach of the police power, according to its largest definition, its language was: "While we are not prepared to say that the legislature can make valid contracts on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced, it cannot, by contract, limit the exercise of those powers to the prejudice of the general welfare. They are the *public health* and the *public morals*. The preservation of these is so necessary to the best interests of social organization, that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime," pp. 750–1. In that case, four members of this court, while assenting to the doctrine that the State cannot limit the exercise of her powers to the prejudice of the public health and the public morals, concurred in the judgment upon the general ground, among others, that the act of 1869, giving exclusive privileges to the company, the validity of

whose charter, in that respect, was the matter determined in the *Slaughter-House Cases*, was not, in any just or legal sense, an exercise of the police power for the preservation of the public health, but, under the pretence simply of exerting that power, was an invasion of the right of citizens, other than those interested in that particular company, to engage in an ordinary business, open, to every one upon terms of perfect equality, although, at all times, it was subject to such regulations in respect of the locality and the mode in which it should be conducted, as the State might establish.

The principle upon which the decisions in *Beer Co.* v. *Massachusetts*, *Fertilizing Co.* v. *Hyde Park*, *Stone* v. *Mississippi*, and *Butchers' Union Co.* v. *Crescent City Live-Stock Landing Co.*, rest, is, that one legislature cannot so limit the discretion of its successors, that they may not enact such laws as are necessary to protect the public health, or the public morals. That principle, it may be observed, was announced with reference to particular kinds of private business which, in whatever manner conducted, were detrimental to the public health or the public morals. It is fairly the result of those cases, that statutory authority given by the State to corporations or individuals to engage in a particular private business attended by such results, while it protects them for the time against public prosecution, does not constitute a contract preventing the withdrawal of such authority, or the granting of it to others.

The present case involves no such considerations. We have seen, the manufacture of gas, and its distribution for public and private use by means of pipes laid, under legislative authority, in the streets and ways of a city, is not an ordinary business in which every one may engage, but is a franchise belonging to the government, to be granted, for the accomplishment of public objects, to whomsoever, and upon what terms, it pleases. It is a business of a public nature, and meets a public necessity for which the State may make provision. It is one which, so far from affecting the public injuriously, has become one of the most important agencies of civilization, for the promotion of the public convenience and the public safety.

It is to be presumed that the legislature of Louisiana, when granting the exclusive privileges in question, deemed it unwise to burden the public with the cost of erecting and maintaining gas-works sufficient to meet the necessities of the municipal government and the people of New Orleans, and that the public would be best protected, as well as best served, through a single corporation invested with the power, and charged with the duty, of supplying gas of the requisite quality and in such quantity as the public needs demanded. In order to accomplish what, in its judgment, the public welfare required, the legislature deemed it necessary that some inducement be offered to private capitalists to undertake, at their own cost, this work. That inducement was furnished in the grant of an exclusive privilege of manufacturing and distributing gas by means of pipes laid in the streets of New Orleans for a fixed period, during which the company would be protected against competition from corporations or companies engaged in like business. Without that grant it was inevitable either that the cost of supplying the city and its people would have been made, in some form, a charge upon the public, or the public would have been deprived of the security in person, property, and business which comes from well-lighted streets.

It is not our province to declare that the legislature unwisely exercised the discretion with which it was invested. Nor are we prepared to hold that the State was incapable—her authority in the premises not being, at the time, limited by her own organic law—of providing for supplying gas to one of her municipalities and its inhabitants, by means of a valid contract with a private corporation of her own creation. We may repeat here what was said by Chief-Justice Taney in *Ohio Life Insurance & Trust Co.* v. *Debolt*, 16 How. 415, in reference to the authority of a State to limit the exercise of its power of taxation: "But whether such contracts should be made or not is exclusively for the consideration of the State. It is the exercise of an undoubted power of sovereignty which has not been surrendered by the adoption of the Constitution of the United States, and over which this court has no control. For it can never be maintained in any tribunal in this country

that the people of a State, in the exercise of the powers of sovereignty, can be restrained within narrower limits than that fixed by the Constitution of the United States, upon the ground that they make contracts ruinous or injurious to themselves. The principle that they are the best judges of what is for their own interest is the foundation of our political institutions. It is equally clear, upon the same principle, that the people of a State may, by the form of government they adopt, confer on their public servants and representatives all the power and rights of sovereignty which they themselves possess; or may restrict them within such limits as may be deemed best and safest for the public interest." pp. 428–9. After observing that the power of the State to make contracts may be indiscreetly and, for the public, injuriously exercised, he proceeds: "Yet if the contract was within the scope of the authority conferred by the Constitution of the State, it is like any other contract made by competent authority, binding upon the parties. Nor can the people or their representatives, by any act of theirs afterwards, impair its obligation. When the contract is made the Constitution of the United States acts upon it and declares that it shall not be impaired, and makes it the duty of this court to carry it into execution. That duty must be performed." p. 429.

With reference to the contract in this case, it may be said that it is not, in any legal sense, to the prejudice of the public health or the public safety. It is none the less a contract because the manufacture and distribution of gas, when not subjected to proper supervision, may possibly work injury to the public; for, the grant of exclusive privileges to the plaintiff does not restrict the power of the State, or of the municipal government of New Orleans acting under authority for that purpose, to establish and enforce regulations which are not inconsistent with the essential rights granted by plaintiff's charter, which may be necessary for the protection of the public against injury whether arising from the want of due care in the conduct of its business, or from an improper use of the streets in laying gas pipes, or from the failure of the grantee to furnish gas of the required quality and amount.

The constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations.

Whatever therefore in the manufacture or distribution of gas in the city of New Orleans proves to be injurious to the public health, the public comfort, or the public safety, may notwithstanding the exclusive grant to plaintiff, be prohibited by legislation, or by municipal ordinance passed under legislative authority. It cannot be said with propriety, that to sustain that grant is to obstruct the State in the exercise of her power to provide for the public protection, health, and safety. The article in the State Constitution of 1879 in relation to monopolies is not in any legal sense an exercise of the police power for the preservation of the public health, or the promotion of the public safety; for, the exclusiveness of a grant has no relation whatever to the public health, or to the public safety. These considerations depend upon the nature of the business or duty to which the grant relates, and not at all upon the inquiry whether a franchise is exercised by one rather than by many. The monopoly clause only evinces a purpose to reverse the policy, previously pursued, of granting to private corporations franchises accompanied by exclusive privileges, as a means of accomplishing public objects. That change of policy, although manifested by constitutional enactment, cannot affect contracts which, when entered into, were within the power of the State to make, and which, consequently, were protected against impairment, in respect of their obligation, by the Constitution of the United States. A State can no more impair the obligation of a contract by her organic law than by legislative enactment; for, her constitution is a law within the meaning of the contract clause of the National Constitution. *Railroad Co.* v.

*McClure*, 10 Wall. 511; *Ohio Life Ins. & T. Co.* v. *Debolt*, 16 How. 416, 429; *Sedgwick's Stat. & Const. Law*, 637. And the obligation of her contracts is as fully protected by that instrument against impairment by legislation as are contracts between individuals exclusively. *New Jersey* v. *Wilson*, 7 Cranch, 164; *Providence Bank* v. *Billings*, 4 Pet. 514; *Green* v. *Biddle*, 8 Wheat. 1; *Woodruff* v. *Trapnall*, 10 How. 190; *Wolff* v. *New Orleans*, 103 U. S. 358.

If, in the judgment of the State, the public interests will be best subserved by an abandonment of the policy of granting exclusive privileges to corporations, other than railroad companies, in consideration of services to be performed by them for the public, the way is open for the accomplishment of that result, with respect to corporations whose contracts with the State are unaffected by that change in her organic law. The rights and franchises which have become vested upon the faith of such contracts can be taken by the public, upon just compensation to the company, under the State's power of eminent domain. *West River Bridge Co.* v. *Dix, ubi supra; Richmond &c. Railroad Co.* v. *Louisa Railroad Co.*, 13 How. 71, 83; *Boston Water-Power Co.* v. *Boston & Worcester Railroad*, 23 Pick. 360, 393; *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co.*, 2 Gray, 1, 35. In that way the plighted faith of the public will be kept with those who have made large investments upon the assurance by the State that the contract with them will be performed.

The demurrer to the bill of complaint should have been overruled. Upon its averments the complainant was entitled to a decree perpetually restraining the defendants, and each of them, their servants, agents and employees, from the manufacture and distribution of gas in New Orleans, by means of pipes, mains, and conduits laid in or along the streets and other public ways and places of that city.

*The decree dismissing the bill is reversed, and the cause remanded for further proceedings in conformity with this opinion.*