## IOWA TELEPHONE CO. v. CITY OF KEOKUK.

(District Court, S. D. Iowa, E. D.   June 19, 1915.)

1. COURTS ☞366—FEDERAL COURTS—ENFORCEMENT OF RIGHTS UNDER STATE STATUTES.

In construing an Iowa statute, to determine the rights to the use of city streets granted to a telephone company thereby, the federal District Court must accept the decisions of the highest court of the state as correctly interpreting the legislative will.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. ☞366.]

2. TELEGRAPHS AND TELEPHONES ☞10—RIGHTS IN CITY STREETS—"HIGHWAYS"—STATUTE.

Under Code Iowa 1873, § 1324, as amended by Acts 19th Gen. Assem. c. 104, to provide that any person or company may construct a telegraph or telephone line along the public highways of the state, a telephone company was authorized to construct its lines in city streets as well as in country highways, since the word "highways" means either country roads or streets of cities and towns.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☞10; Municipal Corporations, Cent. Dig. § 1487.

For other definitions, see Words and Phrases, First and Second Series, Highway.]

3. CONSTITUTIONAL LAW ☞134—OBLIGATION OF CONTRACTS—CONTRACT OF STATE—FRANCHISE IN STREETS.

Where a state statute granted a telephone company the right to construct its lines in city streets, on the faith of which its line was built, subsequent state legislation could not deprive the company of its franchise in the streets, as such a law would impair the obligation of a contract.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 344; Dec. Dig. ☞134.]

4. CONSTITUTIONAL LAW ☞134—STATUTES—CONSTRUCTION.

Code Iowa 1897, §§ 775, 955, providing that noncharter cities and towns may authorize and regulate telephone wires, etc., and that cities under special charter may grant individuals or corporations the authority to erect, maintain, or purchase telephone systems, must be construed, with reference to the constitutional prohibition against the impairment of contracts by a state, as not depriving a telephone company of its rights in the use of city streets for the maintenance of its lines, acquired under prior statutes, by authorizing the municipality to require a franchise from itself as a condition precedent to the company's maintenance of its plant.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 344; Dec. Dig. ☞134.]

5. TELEGRAPHS AND TELEPHONES ☞10—RESERVATION OF POWER TO REVOKE.

Where, in granting to telephone companies franchises in public highways and streets, the state expressly reserves power to revoke the grant, a corporation accepting such rights in the streets cannot complain if such power of revocation is exercised.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☞10; Municipal Corporations, Cent. Dig. § 1487.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6.** CORPORATIONS ⟨⟩617—DISSOLUTION—EFFECT ON PROPERTY.

The dissolution of a corporation, by revocation of its charter or otherwise, has no effect on its property rights, which, under the statutes of Iowa, vest in trustees for the benefit of those interested in the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2448–2456; Dec. Dig. ⟨⟩617.]

**7.** TELEGRAPHS AND TELEPHONES ⟨⟩10—RESERVATION OF RIGHT TO ALTER CHARTER—STATUTE—"CORPORATE FRANCHISE"—"FRANCHISE OF CORPORATION."

Const. Iowa, art. 8, § 12, providing that the General Assembly may amend and repeal all laws for the organization or creation of corporations, or the granting of special or exclusive privileges or immunities, and that no exclusive privileges, except as provided, shall ever be granted, and Code Iowa 1897, § 1619, providing that the articles of incorporation, by-laws, rules, and regulations of corporations shall at all times be subject to legislative control, and may be altered, abridged, or set aside by law, and that every franchise obtained by a corporation may be regulated, withheld, or be subject to such conditions upon its enjoyment as the General Assembly shall deem necessary, did not authorize the state to empower a municipality to require a telephone company to secure a city franchise as a condition precedent to the right to maintain its plant in the city streets, which right was secured by the company under previous legislation, since the franchise to which the statute refers is not any property right of the corporation, such as the right to use streets, which is a "franchise of a corporation," but is rather the "corporate franchise," which is the right and authority derived from the state to be a corporation.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ⟨⟩10; Municipal Corporations, Cent. Dig. § 1487.]

For other definitions, see Words and Phrases, First and Second Series, Corporate Franchise; Franchise.]

**8.** FRANCHISES ⟨⟩2—RESERVATION OF POWER OF REGULATION.

When granting a franchise, the granting Legislature or municipality may reserve, and impliedly does reserve, powers of regulation as to matters not expressly defined by the grant; but such powers do not amount to the power of confiscation or total destruction.

[Ed. Note.—For other cases, see Franchises, Cent. Dig. § 2; Dec. Dig. ⟨⟩2.]

**9.** TELEGRAPHS AND TELEPHONES ⟨⟩10—RIGHTS IN STREET—PERPETUAL FRANCHISE—FIXING RATES—PUBLIC POLICY.

The grant to a telephone company of a perpetual franchise to maintain its wires in city streets, not only granting the right, but fixing the conditions under which it may be exercised and the rates to be charged for the company's service, would be clearly against public policy.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ⟨⟩10; Municipal Corporations, Cent. Dig. § 1487.]

**10.** TELEGRAPHS AND TELEPHONES ⟨⟩10—PERPETUAL FRANCHISE TO USE STREETS—RESERVATION OF POWER TO REGULATE.

Where the state, in granting a telephone company the right to use the streets of a city for its lines, did not specify the conditions of such use, the power to prescribe such conditions was reserved.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ⟨⟩10; Municipal Corporations, Cent. Dig. § 1487.]

11. MUNICIPAL CORPORATIONS ⬤➡57—POWER TO MAKE LAWS.

Being governments of enumerated powers, exercising only the authority delegated by the state, cities have no inherent right to make laws or regulations other than as specifically authorized by charter or general law.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 144, 148; Dec. Dig. ⬤➡57.]

12. MUNICIPAL CORPORATIONS ⬤➡680, 681—RIGHTS IN STREETS—POWER OF NONCHARTER CITY TO REQUIRE AND GRANT FRANCHISE.

By the Iowa statutes under which noncharter cities' are organized, though very broad in empowering such cities to adopt all ordinances for the welfare of the public not inconsistent with law, the Legislature conferred no power upon such cities to grant a franchise to a telephone company to use its streets for its lines, or to require, as a condition precedent to the maintenance of such lines, that the company secure a city franchise.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. ⬤➡680, 681.]

13. MUNICIPAL CORPORATIONS ⬤➡680, 681—POWER OF CHARTER CITY TO REQUIRE FRANCHISE—EXERCISE OF "POLICE POWER"—EXERCISE OF "POWER OF SOVEREIGNTY."

By the charter of the city of Keokuk, Iowa, granting it power to lay out squares or grounds, streets, alleys, etc., to alter, widen, vacate, and extend them, and to make and publish such laws and ordinances as shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals; order, comfort, and convenience of the city and its inhabitants, the city was not vested with power to require by ordinances that as a condition precedent to the right to maintain its lines in city streets a telephone company, which had been granted such right previously by the state, should secure a franchise from the city; the power to grant such a franchise being an "exercise of sovereignty," and not an "exercise of police power."

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. ⬤➡680, 681.

For other definitions, see Words and Phrases, First and Second Series, Police Power; Power of Sovereignty.]

14. TELEGRAPHS AND TELEPHONES ⬤➡10—RIGHTS IN STREETS—ACCEPTANCE OF FRANCHISE FROM CITY—ESTOPPEL.

The city of Keokuk, Iowa, passed an ordinance granting to the W. Telephone Company for 10 years the right to operate and use a system of telephones, prescribing the manner in which the wires and poles should be placed and other conditions, and the ordinance was accepted by the company and the system installed. The C. Telephone Company having acquired the rights of the W. Telephone Company, the city passed an ordinance granting it a 10-year franchise, also specifying the manner in which the streets should be used; such ordinance being accepted by the C. Company. Thereafter the I. Telephone Company purchased all the property rights of the C. Company in the city, including the privileges under the ordinances. The city passed an ordinance requiring that all telephone companies, as a condition precedent to maintaining their lines in its streets, should procure a franchise from the city. The I. Company derived its right to use the streets from an occupation thereunder by virtue of a state statute, so that the attempted regulation by the city was ineffectual; but the city claimed that the acceptance of prior ordinances by the I. Company's predecessors estopped it to deny the city's power and to claim rights under the state law. *Held*, that such acceptances were inoperative as an estoppel, since, when the city assumed to grant

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

franchises to the telephone companies, it had no such power; that being vested in the state.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☞10; Municipal Corporations, Cent. Dig. § 1487.]

15. TELEGRAPHS AND TELEPHONES ☞10—RIGHTS IN STREETS—ACCEPTANCE OF FRANCHISE FROM CITY—ESTOPPEL.

Where a city passed an ordinance requiring that all telephone companies should, as to certain territories, place their wires under ground, and prescribing numerous other conditions, such ordinance being duly observed by a company, such acceptance of the ordinance did not estop the company from setting up the invalidity on account of a state franchise of a subsequent ordinance requiring that, as a condition precedent to maintaining its plant in the city streets, it should procure a city franchise, since the acceptance of the ordinance, which did not purport to grant a franchise, could have effect only in relation to the regulations and conditions which it imposed.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☞10; Municipal Corporations, Cent. Dig. § 1487.]

16. TELEGRAPHS AND TELEPHONES ☞10—OBLIGATION OF CONTRACTS—STATE CONTRACT.

Where, under statute authorization, a telephone company constructed its lines in city streets, thus securing a perpetual franchise of occupation, which could not be revoked by the Legislature, the Legislature could not confer upon the municipality, when it adopted a commission form of government, the power to revoke such right of occupation.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☞10; Municipal Corporations, Cent. Dig. § 1487.]

17. TELEGRAPHS AND TELEPHONES ☞33—REGULATION OF RATES BY MUNICIPALITY—STATUTE.

Under the general powers conferred upon the city of Keokuk, Iowa, authorizing enactments for the general welfare, and Code Iowa, 1897, § 959, providing that cities under a commission form of government may regulate telephone wires, the city of Keokuk had no power to fix the maximum rates to be charged by a telephone company occupying its streets, since the fact that the Legislature specifically conferred upon the city the power to fix rates for water, gas, light, and power service, but limited its power as to telephones to "regulate," implied that it was not the legislative intention to confer on the city the rate-making power as to telephones.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ☞33.]

18. TELEGRAPHS AND TELEPHONES ☞33—REGULATION—RATES.

The power to fix rates to be charged by telephone companies inheres originally in the state.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 21; Dec. Dig. ☞33.]

In Equity. Suit by the Iowa Telephone Company against the City of Keokuk. On exceptions to the master's report. Exceptions overruled.

Parker, Parrish & Miller, of Des Moines, Iowa, and Hazen I. Sawyer, of Keokuk, Iowa, for complainant.

W. B. Collins, H. R. Collins, and Theodore A. Craig, City Atty., all of Keokuk, Iowa, for defendant.

WADE, District Judge. 1. The complainant, the Iowa Telephone Company, and its grantors, have been occupying the streets of Keokuk, Iowa (a special charter city), since about 1882, and large sums of money have been expended in building and equipping its telephone system and exchange, to meet the needs of the people of Keokuk, and to furnish facilities for long-distance messages in this and other states. On August 2, 1913, an ordinance was duly passed by the city of Keokuk, which fixed the maximum rates which could be charged by any telephone company in that city, and which also provided:

"It shall be unlawful for any person or corporation to operate a telephone plant in the city of Keokuk, without a franchise granted by said city"

—and fixing a penalty for its violation. This ordinance being general, and applying to all persons and corporations, the Iowa Telephone Company commenced this action to test the validity of said ordinance as it affected said corporation.

Issue being joined, the case was referred to Hon. Robert Sloan, special master, before whom the case was tried, reserving by special agreement the trial of the questions as to whether, in case it should be held that the city had the power to fix the maximum rates, the rates fixed by the ordinance were confiscatory. On January 7, 1914, the master filed his report, setting forth the facts, and holding as conclusions of law that the ordinance was invalid in so far as it purported to affect any of the rights of the complainant herein to use the streets, and that it was also invalid in so far as it attempted to fix the maximum rates for telephone service of the complainant in the city of Keokuk. The case comes before the court upon exceptions to the master's report.

2. It will be seen that the case presents two questions: First, has the city of Keokuk power to prohibit complainant from continuing its business in the city of Keokuk, without first procuring a franchise? And, second, has the city of Keokuk power to fix the maximum rates to be charged by the Iowa Telephone Company operating within the confines of the city?

The validity of the ordinance, making it "unlawful for any person or corporation to operate a telephone plant in the city of Keokuk without a franchise granted by said city," in so far as it may affect other persons or corporations, is not before the court, and is not decided. The power of the city to fix rates for telephones is involved only as to the Iowa Telephone Company, complainant herein.

3. First. Is the ordinance, which provides that it "shall be unlawful for any person or corporation to operate a telephone plant in the city of Keokuk without a franchise granted by said city," valid as to the complainant herein?

Different ordinances prior to 1913 are relied upon by the city in support of the ordinance of 1913 as it affects complainant, and special reliance is placed upon the fact that Keokuk is a special charter city; but I deem it advisable to first consider the rights of complainant under the general law, as applied to cities incorporated under the general laws of the state, without reference to any ordinances heretofore

adopted. Thus construed, it does not present a question new to the courts of Iowa. In fact, the principal questions involved have all been definitely decided by the Supreme Court of this state.

[1, 2] Section 780 of the Iowa Code of 1851 provided:

"Any person or company may construct a telegraph line along the public highways of this state, or across the rivers or over any lands belonging to the state or to any private individual, and may erect the necessary fixtures therefor."

This was enacted as section 1348 of the Revision of 1860, and again as section 1324 of the Code of 1873. In 1882 it was amended (chapter 104 of the Acts of the Nineteenth General Assembly, by inserting the words "or telephone" after the word "telegraph." In 1888 the Legislature for the first time gave direct power to cities to "regulate" telephone and telegraph, electric light, district telegraph, and other electric wires. Chapter 16, Acts of the Twenty-Second General Assembly.

The first legislation in Iowa in which cities were directly empowered to grant authority to telephone systems appears in the Code of 1897, as follows:

"Sec. 775. Regulation as to Electric Wires. Cities and towns shall have the power to *authorize* and regulate telegraph, district telegraph, *telephone*, street railway and other electric wires."

Or, as applied to cities acting under special charter:

"Sec. 955. * * * They may also grant individuals or private corporations the *authority* to *erect, maintain or purchase* such works or plants, or railways, street railways or *telephone systems*, for the term of not more than twenty-five years, and may renew or extend the term of such grants for a period not exceeding twenty-five years; but no exclusive franchise shall be thus granted, extended or renewed, and no franchise shall be *granted or authorized*, until after notice of the application therefor has been published once each week for four consecutive weeks in some newspaper published in such city. (23 G. A. c. 11, § 1; 22 G. A. c. 11, §§ 1, 2; 22 G. A. c. 26; 14 G. A. c. 78, §§ 2-5; C. '73, § 471)."

The direct question as to the power of a city to grant authority for the establishment of a telephone system came before the Supreme Court in Chamberlain v. Iowa Telephone Company, 119 Iowa, 619, 93 N. W. 596. In this case plaintiffs brought an action to restrain the Iowa Telephone Company from occupying the streets and alleys of the city of Des Moines, because it had no franchise granted by said city, and no authority to use the streets of said city. The Supreme Court passed directly upon the question as to whether or not, under the legislation prior to the Code of 1897, a telephone company had the right to use the streets of a city for the purpose of maintaining its poles and wires, without any direct authority from the city itself.

The facts under which the Iowa Telephone Company occupied the streets of the city of Des Moines were very similar to the facts under which the same company, complainant herein, occupies the streets of the city of Keokuk. The Supreme Court directly held that the term "public highways," as used in section 780 of the Code of 1851, re-enacted as aforesaid as section 1348 of the Revision and section

1324 of the Code of 1873, included the streets and alleys of an incorporated town or city. The court uses this language:

"Whatever rights telegraph companies were given by the original act were conferred upon telephone companies by chapter 104 of the Acts of the Nineteenth General Assembly. It matters not whether telegraph companies made a limited use of the streets and alleys of cities or not. They were not so limited by the law, and this was well known. It was also known by all that the principal business of telephone companies was confined to urban ways. True, they had then used rural ways to a limited extent, and it may have been apparent to the Legislature that the rural service would be extended, and the long-distance phone finally become one of the great public conveniences and necessities which it now is. But, notwithstanding this, they were given the use of highways and streets without limitation, and without control by city authorities. If the Legislature had intended to limit their use of the streets to long-distance service, it would doubtless have done so by the use of apt words. That such was not its intention was further manifest from the fact that prior to the amendatory act in question this court had practically held that the words 'telegraph companies,' as used in the statute, included telephone companies. Iowa Telephone Company v. Board of Equalization, 67 Iowa, 250, 25 N. W. 155; Franklin v. Northwestern Telephone Co., 69 Iowa, 97, 28 N. W. 461."

This was a well-considered case, and the authorities are fully reviewed, and the court sums up in the following language:

"We reach the conclusion that the defendant's use of the streets and alleys of Des Moines, is authorized by the statute."

The same conclusion was reached by the Supreme Court in State of Iowa v. Nebraska Telephone Company, 127 Iowa, 194, 103 N. W. 120, in which the court says:

"The grant to use the streets was without limitation as to territory, and under its authority there can be no question as to the right to extend the service to meet the demands of the public. The very nature of the business demands the use of many streets, and may demand the use of every street in the city, and this was doubtless contemplated by the Legislature when the unlimited grant was made."

These two cases were decided with relation to rights acquired by telephone companies prior to the Code of 1897. The Supreme Court later considered the question as to the right to use the streets by companies whose rights accrued subsequent to the Code of 1897. E. Boyer Telephone Co. v. Vail, 129 N. W. 298; Farmers' Telephone Co. v. Town of Washta, 133 N. W. 361; E. Boyer Telephone Co. v. Vail, 136 N. W. 120; E. Boyer Telephone Co. v. Vail, 147 N. W. 327.

I have carefully considered these cases, but I find nothing in them which modifies the rule laid down in Chamberlain v. Iowa Telephone Co., and State of Iowa v. Nebraska Telephone Co. In fact, the court in the Washta Case expressly recognizes the rule in the Chamberlain Case, and denies any intention of modifying the same. The following language is used:

"The case of Chamberlain v. Telephone Company, 119 Iowa, 619, 93 N. W. 596, on which appellants place much reliance, is not here a controlling authority. The telephone line or system there in controversy had been erected, and the rights of the company had vested, under a general statute substantially identical with the present Code section 2158. This was, however, prior to the enactment found in Code, §§ 775 and 776, and the effect of these provisions and the authority and power thereby vested in cities and towns was in no

manner discussed or considered. The one thing there considered was the construction of the general statute, authorizing persons and corporations to erect telegraph and telephone lines on all the public highways of the state; and it was held that the words 'public highways' necessarily included city streets, and that the telephone company's rights therein were therefore not referable to any grant or franchise from the city. With the correctness of that decision, upon the issue as there made, we have no quarrel."

It is the duty of this court to accept the foregoing decisions of the highest court of the state as correctly interpreting the legislative will. Hamilton Gaslight Co. v. City of Hamilton, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963; Louisville Co. v. Mississippi, 133 U. S. 587, 10 Sup. Ct. 348, 33 L. Ed. 784; Detroit v. Osborne, 135 U. S. 492, 10 Sup. Ct. 1012, 34 L. Ed. 260.

4. But even if it were an original question, upon which the state court had not expressed an opinion, I should have to reach the same conclusion. The word "highways" may be construed, under the authorities, as meaning merely country roads, or as including streets of cities and towns. As applied to telephone companies, section 1324 of the Code of 1873, as amended by the Acts of the 19th General Assembly, should have the same construction as it would have with reference to the authority to construct a "telegraph line," because there was no change made in the section; the words "or telephones" being simply inserted therein. It is easy to see why the Legislature should have an intention to grant to telegraph lines and telephone lines the right to erect their poles and wires, not only upon the public highways, but upon the city streets as well. In fact, the grant to use the highways in the country would be of little value, if the same grant did not authorize the use of the streets of the town or city. Neither telegraph lines nor telephone lines are of any practical use, unless they are permitted to enter the towns and cities. It is at these points that the public reach them. It is in the centers of population that these great public utilities must of necessity establish their offices and their points of communication. The state was, and is, interested in the development of these means of communication, and it is hardly conceivable that in the early days the Legislature would enact a law which contemplated that every town and city would have the power to stop the construction of telegraph and telephone lines at the corporate limits, and, if they desired, bar them from entrance. Such legislation might result in having, not continuous lines of telegraph wires and telephone wires, but short sections, separated from each other by the adverse sentiment of different communities. As the Supreme Court of Iowa said in State v. Nebraska Telephone Co., supra:

"The very nature of the business demands the use of many streets, and may demand the use of every street in the city, and this was doubtless contemplated by the Legislature when the unlimited grant was made."

It is equally true that the "very nature of the business demands the use" of streets of the city in connection with the country highways. The same question has arisen in different states, and the rulings have been almost uniformly in accordance with the holding in the Chamberlain Case. City of Duluth v. Duluth Telephone Co.,

84 Minn. 486, 87 N. W. 1127; Abbott v. City of Duluth (C. C.) 104 Fed. 833; Wisconsin Telephone Co. v. Oshkosh, 62 Wis. 32, 21 N. W., 828; State v. Sheboygan, 111 Wis. 23, 86 N. W. 659; Duke v. Telephone Co., 63 N. J. Law, 341, 21 Atl. 460, 11 L. R. A. 664; Cumberland Telephone Co. v. U. S. Electric Railway (C. C.) 42 Fed. 273, 12 L. R. A. 544; State v. City of Milwaukee, 132 Wis. 669, 113 N. W. 40; Michigan Tel. Co. v. City of Benton Harbor, 121 Mich. 512, 80 N. W. 386, 47 L. R. A. 104; City of Wichita v. Old Colony Trust Co., 132 Fed. 641, 66 C. C. A. 19; City of Wichita v. Tel. Co., 70 Kan. 441, 78 Pac. 886; New Hope Tel. Co. v. City of Concordia, 81 Kan. 514, 106 Pac. 35; City of Texarkana v. Tel. Co., 48 Tex. Civ. App. 16, 106 S. W. 917; Telephone Co. v. Towanda, 221 Ill. 299, 77 N. E. 456; Sunset Telephone Co. v. Pomona, 172 Fed. 829, 97 C. C. A. 251; City of Rochester v. Bell Telephone Co., 52 App. Div. 6, 64 N. Y. Supp. 804.

[3] 5. The legislative enactment being construed to include city streets, then it can hardly be contended that with reference to persons or companies accepting the privilege granted, and investing large sums in establishing lines and exchanges, the rights thus acquired can be taken arbitrarily away by subsequent legislation. The wisdom and the sense of justice of the framers of the Constitution of the United States are admirably reflected in that provision which prohibits any state from passing any "law impairing the obligation of contracts." This restraint upon the states is a permanent guaranty in behalf of the humblest citizen as well as the largest corporation, and has been uniformly upheld by all the courts of the country, state and national, in every case where it has been attempted by legislation to deprive men or corporations of vested rights acquired under prior enactments of the Legislature. It was this constitutional provision which the Supreme Court of Iowa applied in the Chamberlain Case and in the Nebraska Telephone Case. It is applied by the Supreme Court of the United States in City of Louisville v. Cumberland Telephone Co., 224 U. S. 649, 32 Sup. Ct. 572, 56 L. Ed. 934, in which it is said:

"In considering the duration of such a franchise, it is necessary to consider that a telephone system cannot be operated without the use of poles, conduits, wires, and fixtures. These structures are permanent in their nature and require a large investment for their erection and construction. To say that the right to maintain these appliances was only a license, which could be revoked at will, would operate to nullify the charter itself, and thus defeat the state's purpose to secure a telephone system for public use. For, manifestly, no one would have been willing to incur the heavy expense of installing these necessary and costly fixtures, if they were removable at will of the city and the utility and value of the entire plant be thereby destroyed. Such a construction of the charter cannot be supported, either from a practical or technical standpoint. This grant was not at will, nor for years, nor for the life of the city. Neither was it made terminable upon the happening of a future event; but it was a necessary and integral part of the other franchises conferred upon the company, all of which were perpetual and none of which could be exercised without this essential right to use the streets."

It was applied by the Supreme Court of the United States in Russell v. Sebastian, 233 U. S. 195, 34 Sup. Ct. 517, 58 L. Ed. 921, Ann. Cas. 1914C, 1282, in the following language:

"When the voice of the state declares that it is bound if its offer is accepted, and the question simply is with respect to the scope of the obligation, we should be slow to conclude that only a revocable license was intended. Moreover, the provision plainly contemplated the establishment of a plant devoted to the described public service and an assumption of the duty to perform that service. That the grant, resulting from an acceptance of the state's offer, constituted a contract, and vested in the accepting individual or corporation a property right, protected by the federal Constitution, is not open to dispute in view of the repeated decisions of this court. New Orleans Gaslight Co. v. Louisiana Light & H. P. & Mfg. Co., 115 U. S. 650, 660, 6 Sup. Ct. 252, 29 L. Ed. 516, 520; New Orleans Waterworks Co. v. Rivers, 115 U. S. 671, 680, 681, 6 Sup. Ct. 273, 29 L. Ed. 525, 527, 528; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 9, 19 Sup. Ct. 77, 43 L. Ed. 341, 345; Louisville v. Cumberland Teleph. & Teleg. Co., 224 U. S. 649, 663, 664, 32 Sup. Ct. 572, 56 L. Ed. 934, 940, 941; Grand Trunk Western R. Co. v. South Bend, 227 U. S. 544, 552, 33 Sup. Ct. 303, 57 L. Ed. 633, 639, 44 L. R. A. (N. S.) 405; Owensboro v. Cumberland Teleph. & Teleg. Co., 230 U. S. 58, 65, 33 Sup. Ct. 988, 57 L. Ed. 1389, 1393; Boise Artesian Hot & Cold Water Co. v. Boise City, 230 U. S. 84, 90, 91, 33 Sup. Ct. 997, 57 L. Ed. 1400, 1406, 1407; Dill. Mun. Corp. (5th Ed.) § 1242."

[4] The legislation (Code 1897) must be construed with reference to this constitutional provision; it cannot be assumed that there was any intention upon the part of the Legislature to violate this constitutional restraint. So that, when cities were finally given the power "to authorize," or to "grant authority" for, the erection or maintenance of telephone systems, it is clear that the Legislature did not intend that such enactment should be retroactive, or that it should be effectual to destroy rights already acquired. It is apparent, of course, that if it be now held that, in order to continue to transact business in the city of Keokuk, the complainant must procure a franchise, it follows that it must be held that it has no rights whatsoever in the streets, and unless it can procure a franchise, which of course is optional with the city, its entire property in the city of Keokuk is worthless; not only is its property in the city of Keokuk worthless, but its lines extending to and from the city of Keokuk are practically valueless. Prior to the Code of 1897, its rights in the city of Keokuk were valuable, and, if they should be now held to be worthless, it follows that the complainant has been deprived of valuable property rights by an act of the Legislature, which is the very thing prohibited by the Constitution—the fundamental law of the land.

[5] 6. But to meet this counsel insist that the rights acquired by telegraph and telephone companies under section 780 of the Code of 1851, section 1348 of the Revision of 1860, section 1324 of the Code of 1873, as amended by chapter 104 of the Acts of the 19th General Assembly, were granted subject to an express reservation by the state, which enabled the state to at any time withdraw the privilege granted. Of course, the contract between the owner of a telegraph or telephone company and the state, by which a right is granted to use the public highways and streets of the state, is just the same as a contract between two individuals. If there is an express power to revoke, the contract and rights are accepted with full knowledge that they are to continue only until revoked, and the party accepting such rights, cannot complain when the power is exercised; and if the state of

Iowa, in inviting telegraph and telephone companies to occupy the highways of the state, made it a condition of the privilege conferred that it could revoke such privilege at its option, then those who accepted the privilege would have to bear the loss incident to the exercise of the power of revocation reserved.

[6, 7] In this case counsel rely upon section 1090, Code of 1873 (section 1619, Code of 1897), as an express reservation by the state, authorizing it to at any time withdraw or revoke any right or franchise which the telephone company acquired by constructing its lines under authority of section 1324 of Code of 1873, as amended by chapter 104 of the Acts of the 19th General Assembly. The section relied upon is as follows:

"The articles of incorporation, by-laws, rules, and regulations of corporations hereafter organized under the provisions of this title, or whose organization may be adopted or amended hereunder, shall, at all times, be subject to legislative control, and may be, at any time, altered, abridged, or set aside by law, and every franchise obtained, used, or enjoyed by such corporation, may be regulated, withheld, or be subject to conditions imposed upon the enjoyment thereof, whenever the General Assembly shall deem necessary for the public good."

Reference is also made to section 12, art. 8, of the Constitution of Iowa, which is as follows:

"Subject to the provisions of this article, the General Assembly shall have power to amend or repeal all laws for the organization or creation of corporations, or granting of special or exclusive privileges or immunities, by a vote of two-thirds of each branch of the General Assembly; and no exclusive privileges, except as in this article provided, shall ever be granted."

The argument in support of the claim that these provisions constitute an expressed reservation of power to enact sections 775 and 776 of the Code of 1897 fails to observe the distinction between the "franchise" referred to in section 1619 of the Code of 1897 and the "franchise" or privilege acquired by telephone companies acting under the authority of section 1324, Code of 1873. The provisions of the Code and the Constitution as aforesaid clearly have reference to the powers granted to a corporation, and have no relation to the property rights of a corporation acquired under such powers. The corporation being a creature of statute, the Legislature expressly reserved the right to change the powers granted and to take away such powers at any time. This reservation authorized the state to even dissolve a corporation and destroy all its functions; but even this would in no manner affect property rights acquired by it before its dissolution or destruction.

That the constitutional provision relates solely to the powers of a corporation, as distinguished from their property rights, has been settled by the Supreme Court in Des Moines Street Railway Co. v. Street Railway Co., 73 Iowa, 523, 33 N. W. 610, 35 N. W. 602, in which it is said:

"The article limits, to some extent, the powers and rights which a body of men might claim as a corporation. We do not think that it was intended to limit the powers and rights of individuals, except in their relation to a corporation. Now, while it may be that the plaintiff's assignor was a cor-

poration, yet the right in question [a public franchise] was not a corporate right. If it exists, it is simply by contract, as an individual might obtain and enjoy the right."

The confusion, I think, comes on account of the term "franchise" in the section relied upon; but this term is repeatedly used in the Code as descriptive of the power vested in a corporation by law to transact business of any kind.

The distinction between the "franchise" of a corporation as such and the privilege acquired by legislative or municipal grant to use the street for some purpose, which privilege is also usually designated as a "franchise," is well illustrated by the Supreme Court of Iowa in Cedar Rapids Water Co. v. Cedar Rapids, 118 Iowa, 234, 91 N. W. 1081, in which it is said:

"It follows, then, without argument, that under the ordinance of 1875 the plaintiff obtained a privilege which may properly be called a 'franchise,' in the common acceptance of that term; that is, the right or privilege of supplying the city of Cedar Rapids and its inhabitants with water, and of occupying the streets of the city for that purpose. It must be said, however, that plaintiff's privilege of supplying the city with water is not, in the strict sense of the word, a 'corporate franchise'; that is, it is not a privilege derived from or obtained by the act of incorporation. Its charter rights and privileges are such only as come to it through its organization under the general corporation law, and did not and could not include the right to furnish water to the defendant city. Such right could only be acquired after the incorporation was accomplished, and by the agreement and consent of the city. True, the grant of corporate capacity was from the state, and the subsequent grant from the city may be said theoretically to have been also from the state. * * * By making the grant it gave the plaintiff what may be called an 'additional franchise or privilege.' See Bridge Co. v. Prange, 35 Mich. 400, 24 Am. Rep. 585. And, like other franchises, it constituted a contract between the parties, having in general the same incidents and subject to the same interpretation which would obtain between other contracting parties."

The court quotes from the opinion of Chief Justice Cooley in Bridge Co. v. Prange, supra:

"The corporation was brought into existence * * * and existed before the franchise of taking tolls accrued to it by the action of the board of supervisors. That franchise was an additional privilege to those which the organization gave; it was in the nature of a grant, which the organization only clothed the corporation with the capacity to receive. The grant may cease and the corporate existence remain untouched."

And the court might well have added that the corporation might cease, might be totally dissolved, and the grant, commonly denominated "a franchise," continue unimpaired. The statutes of this state expressly provide for the appointment of trustees upon the dissolution of a corporation, to handle its business and dispose of the same for the benefit of the real owners—the persons interested in the corporation. The corporation is only an agency used by individuals through which to administer the property owned in fact by the individuals. As the Supreme Court says in the foregoing, the grant, or franchise, or right which a corporation acquires in a street, is not, "in the strict sense of the word, a corporate franchise." The court emphasizes

the fact that "it is not a privilege derived from or obtained by the act of incorporation."

The corporation may be organized one year; the franchise acquired another. There is no connection between the two; the acquisition of the privilege or franchise being merely an exercise of the power which the corporation acquired, which power under section 1619 of the Code, relied upon by counsel, may at any time be "altered, abridged, or set aside by law," or may be "regulated, withheld, or be subject to conditions imposed."

This plain distinction between the "franchise" of a corporation as such, and the "franchise" acquired by a corporation under its power as a corporation, is plainly pointed out in People v. Cook, 148 U. S. 397, 13 Sup. Ct. 645, 37 L. Ed. 498, in which the court says:

"In the case of People v. O'Brien, 111 N. Y. 1 [18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684], cited by counsel for the plaintiffs in error, while the court held that it was not within the power of the Legislature to destroy the property rights of a corporation, it was not questioned that the Legislature could destroy the existence of the corporation."

In Lord v. Equitable Society, 194 N. Y. 212, 87 N. E. 447, 22 L. R. A. (N. S.) 420, we find:

"The charter of a corporation is the law which gives it existence as such; that is, its general franchise, which can be repealed at the will of the Legislature. A special franchise is the right, granted by the public, to use public property for a public use, but with private profit, such as the right to build and operate a railroad in the streets of a city. Such a franchise, when acted upon, becomes property, and cannot be repealed, unless power to do so was reserved in the grant, although it may be condemned upon making compensation. As we recently said: 'The general franchise of a corporation is its right to live and to do business by the exercise of the corporate powers granted by the state. The general franchise of a street railroad company, for instance, is the special privilege conferred by the state upon a certain number of persons, known as the corporators, to become a street railroad corporation, and to construct and operate a street railroad upon certain conditions. Such a franchise, however, gives the corporation no right to do anything in the public highways without special authority from the state, or some municipal officer or body acting under its authority. When the right of way over a public street is granted to such a corporation, with leave to construct and operate a street railroad thereon, the privilege is known as a special franchise, or the right to do something in the public highway, which, except for the grant, would be a trespass.' People ex rel. Metr. St. Ry. Co. v. State Board of Tax Com'rs, 174 N. Y. 417, 435 [67 N. E. 69, 63 L. R. A. 884, 105 Am. St. Rep. 674]. The right to be a corporation is frequently called a franchise, as it is in one sense, but not in the sense that the grant of a right to build a railroad in a public street is a franchise; and it is unfortunate that the same word is used with widely different meanings, for it leads to confusion unless qualified by an appropriate adjective, such as 'general' or 'special.' The right to be a corporation, or the corporate right of life, is inseparable from the corporation itself. It is a part of it, and cannot be sold or assigned. That franchise is general and dies with the corporation, for it cannot survive dissolution or repeal. On the other hand, grants to do something in the public streets, or special franchises, are not a part of the corporation. They can be made to an individual with the same legal force or effect as to a corporation. Unless there is some legislative restriction, they can be mortgaged and sold. *They are no part of the corporate life, if owned by a corporation, any more than they are a part of individual life, if owned by a human being.*"

The last sentence is forceful language, and points the distinction with emphasis:

*"They are no part of the corporate life, if owned by a corporation, any more than they are a part of individual life, if owned by a human being."*

And this quotation suggests an additional reason why the construction contended for is impossible. The right to construct a telephone line along the public highways was granted by the Legislature to "any person or company." Nothing was said about a corporation, although a corporation would be included under the term "company." The present statute includes the word "corporation." No one, we apprehend, would contend that, if an individual or a partnership owned the telephone system in Keokuk, the Legislature could, under the express reservation relied upon, deprive them of their rights. If a foreign corporation acquired the franchise, it would hardly be contended that under the reservation of the Iowa statute its right could be wiped out. When the Legislature enacted the reservation relied upon, it knew that various forms of property, license, privilege, and franchise might be acquired by individuals, copartners, domestic corporations, and foreign corporations, and it is hardly conceivable that the Legislature had in mind the reservation of the power to wipe out franchises or privileges acquired by a domestic corporation, while individuals, partnerships, and foreign corporations would be unmolested. Especially is this true in view of the constitutional provision of the state of Iowa which prohibits the General Assembly from granting "to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens."

It does not seem possible that the Legislature intended to reserve such a power that it could take away the franchise of the Iowa Telephone Company in the city of Keokuk, while owned by the corporation, but that, if the corporation sold it to an individual, the franchise could not be disturbed. It can hardly be conceived that the Legislature intended to reserve the power to deprive a domestic corporation of its property, while a foreign corporation, with the same power to acquire the same kind of property, would be immune, and clothed with full power of enjoyment. In view of all these considerations, there can be no question but that the reservations pertain only to the corporate existence and corporate power, and not to corporate property. Numerous other cases have emphasized the distinction. Western Union Telegraph Co. v. Hopkins, 160 Cal. 106, 116 Pac. 557; Ex parte Russell, 163 Cal. 668, 126 Pac. 875, Ann. Cas. 1914A, 152; Ex parte Keppelmann, 166 Cal. 770, 138 Pac. 346; City of Lansing v. Michigan Co. (Mich.) 150 N. W. 250.

[8] Counsel rely upon Sioux City Street Railway v. Sioux City, 78 Iowa, 742, 39 N. W. 498; Id., 138 U. S. 106, 11 Sup. Ct. 226, 34 L. Ed. 898. In this case there was no attempt to revoke the franchise of the defendant company, and the burden imposed may be sustained upon the theory that it was only a regulation, and of course it must be conceded that in the granting of every franchise the Legislature or the municipality may reserve, and does reserve, cer-

tain powers of regulation as to matters not expressly defined by the grant. There is a vast difference between the exercise of power of regulation, and the power of confiscation, or total destruction. In any event, the court did not have before it the consideration of the legislative grant involved in this case, and I cannot agree that the reasons given for the decision, as applied to the case at bar, can be sustained.

[9] 7. Much has been said, and many authorities quoted, to the effect that unlimited franchises are against public policy. It will be found, however, that in nearly every case where this principle is announced the court was considering a franchise which not only granted a right, but which fixed the conditions, and often the rates to be charged. As to such franchises there is no question but that a perpetual franchise is considered to be against public policy. Conditions change with the passing years, and rates should change, and conditions of service should change, and the public should have the advantages of new inventions and new methods; so that it would clearly be against public policy to grant a franchise in perpetuity, in which rates and conditions of service were definitely prescribed.

[10] But complainant acquired no such franchise or right. It is helpful all through this case, and especially so in construing the various statutes involved, to bear in mind just what right the complainant did acquire, and what right the state reserved. The only right acquired was the "bare right" to the use of the streets and highways. The conditions of such use not being specified, the power to prescribe such conditions were reserved. The Legislature in its wisdom, having in mind a perpetual grant, knew that conditions of the state and the communities would demand constant change in the manner in which the telegraph and telephone lines should be constructed and maintained, and therefore it retained absolute power to fix the conditions from time to time. Those who constructed telegraph and telephone lines knew that the state reserved this power, and accepted the grant subject thereto.

Companies building telegraph and telephone lines having only the right to the bare use of the highways for the construction of their lines, I fail to see where any principle of public policy obtains. Telegraph lines and telephone lines are a necessity. They do not interfere with the legitimate use of highways for all other purposes. They cannot well exist without using the highways, and the only purpose a city might have in excluding a company from a highway or street would be to permit another to have the use of such highway or street; but, to permit the use of a street by another, it is not necessary to exclude the first. The rights are not exclusive; the state or city is not interested in driving out one occupant to permit another to take its place. The only interest the state or city has is to have good service and fair rates, and the service and the rates are under the absolute control of the state. If a city should be empowered to build telephone systems, the "bare right" of complainant and other companies to use the streets could not interfere with the exercise of such power. The use of a street by one company can be so regulated or

controlled that it will not interfere with any other legitimate use, including use for other like purposes.

Thus construed, the appeal based upon public policy fails. There may have been reasons, based upon public policy, which in 1897 justified the Legislature in requiring a franchise for all future builders of telegraph or telephone lines in cities. As a result of the wise legislation in the past, a network of wires extended all over the state, and every city and town had its exchanges established. It is well known that several exchanges in a city rather increases than diminishes the cost of telephone service, and there was wisdom under existing conditions in granting to cities the power to say whether additional telephone systems should be established or not.

Since 1888 cities have had full power to prescribe every condition and regulation which the interest of the people of the community demanded, subject only to the limitation that they must be reasonable, and not confiscatory. The city of Keokuk exercised this power when, in 1903, it required the complainant to place its wires underground and imposed additional regulations, all of which conditions were accepted and complied with by complainant. I see no reason in public policy why the authority granted by the Legislature for the use of the highways and streets should be considered as contrary to public policy. On the other hand, in view of the encouragement necessary at that time for the establishment of telephone service, and in view of the reservation by the state of the power to fix rates and regulations under which the streets and highways could be used, it may be well said that the Legislature acted with wisdom and foresight.

[11-13] 8. The foregoing disposes of the question presented, if Keokuk were a city organized under the general law, and no ordinances were involved. Does the fact that Keokuk was a special charter city give it a power, not possessed by other cities, to require a franchise before the complainant can continue its use of the streets of the city? In other words, did the state reserve to itself the power of granting the use of streets to telephone companies in all the cities of the state, except the comparatively few special charter cities; and did the state, as to these special charter cities, make an exception, and grant to the special charter cities the exclusive power to determine whether their streets could be used by telephone lines or not? Such a purpose upon the part of the state is hardly conceivable, and certainly could not be shown except by the plainest legislative enactment. It is hard to believe that the Legislature intended to exercise the power to permit the use of the streets in cities surrounding Keokuk by telephone companies, and to authorize the city of Keokuk to, at its pleasure, bar such lines from passing through the city.

The city of Keokuk does not claim any express authority, but insists that the power to grant franchises is included in the power granted in its charter to lay out squares, or grounds, streets, alleys, lanes, or avenues, and highways, and to alter, widen, vacate, and extend the same, and "to make and publish all such laws and ordinances as to them shall seem necessary, to provide for the safety, preserve the

226 F.—7

health, promote prosperity, and improve the morals, order, comfort, and convenience of said city and inhabitants thereof."

"It is a well-settled rule of construction of grants by Legislatures to corporations, whether public or private, that only such powers and rights can be exercised under them as are clearly comprehended within the words of the act, or derived therefrom by necessary implication; regard being had to the objects of the grant. Any doubt or ambiguity arising out of terms used by the Legislature must be resolved in favor of the public." Clark v. Davenport, 14 Iowa, 494.

"Cities have no inherent jurisdiction to make laws or adopt regulations of government. They are governments of enumerated powers, acting by delegated authority. * * * The charter or general law under which they exercise their powers is their constitution, and from it they must show authority for the acts they perform. Cooley on Constitutional Limitations, page 191, and cases cited." City of Keokuk v. Scroggs, 39 Iowa, 447.

These expressions of the Supreme Court of Iowa, in considering the powers of special charter cities, are sustained by numerous other decisions. Merriam v. Moody's Executors, 25 Iowa, 163; Hanger v. City of Des Moines, 52 Iowa, 193, 2 N. W. 1105, 35 Am. Rep. 266; City of Cherokee v. Perkins, 118 Iowa, 405, 92 N. W. 68; Burroughs v. City of Cherokee, 134 Iowa, 430, 109 N. W. 876.

The Legislature conferred no power upon cities not under special charter to require or grant franchises, although the statutes under which noncharter cities are organized are very broad in empowering such cities to adopt all ordinances for the general welfare, not inconsistent with law. The general statute does not include the word "laws," as does the charter of the city of Keokuk, but the grant of the charter to make "such laws and ordinances" certainly does not vest the power in the corporation to pass a "law" inconsistent with the general law of the state. Inasmuch as the state, with reference to cities not under special charter, reserved the power to grant the use of the streets in cities for telephones, I can find nothing in the charter, or in the authorities, which justifies me in believing that it was the intention of the Legislature to confer upon special charter cities this extraordinary power, which is an act of sovereignty, and not an exercise of police power. The regulation of telegraph and telephone lines is an exercise of police power, but the grant is an exercise of sovereign power, which can only be exercised by the state, or by a municipality by the express authority of the state. This express authority was not granted to the city of Keokuk. In Chamberlain v. Iowa Telephone Co., supra, it is said:

"Cities and incorporated towns have no power to permit such companies to use their streets and other public places for their poles and lines, and, unless that power was given in the act in question, they had no right to enter thereon."

The act in question relates to section 1324 of the Code of 1873 as amended, under which complainant claims its right to use the streets of the city of Keokuk. The charter of the city of Keokuk gives it no power with reference to granting or withholding franchise to telephone companies not possessed by the other cities of the state. This conclusion eliminates any application of section 21, chapter 116, of the

Acts of the 16th General Assembly (section 933, Code 1897), which provides that:

"No provisions of this Code, nor laws hereafter enacted, relating to the powers, duties, liabilities, or obligations of cities or towns, shall in any manner affect, or be construed to affect, cities while acting under special charter, unless the same shall have special reference, or are made applicable to such cities."

Counsel insist that this section limits the enactment of the Nineteenth General Assembly, in which the words "or telephone" were inserted in section 1324, because said amendment was not specifically made applicable to special charter cities. Inasmuch as the city of Keokuk had before said amendment no power to grant or withhold telephone franchises, this law did not affect it in the least. It took away no power that it had; it imposed no obligation and no restriction. The section relied upon specifically limits its application to those "laws hereafter enacted relating to the powers, duties, liabilities, or obligations of cities or towns." The act of the Nineteenth General Assembly had no relation to these matters. It dealt purely with the power of the state.

[14] 9. Do the ordinances relied upon by respondent, and the acts of complainant and its grantors under such ordinances, deprive complainant of the rights which it would have under the general law?

October 16, 1882, the city of Keokuk passed ordinance No. 32, granting a right to the Western Telephone Company for a period of 10 years to "operate and use a system of telephones" in the city, and prescribing the manner in which the poles and wires should be placed, and other numerous conditions pertaining to the erection and maintenance thereof. This ordinance was accepted by the corporation on June 11, 1883, and the telephone system was installed and operated. The Central Union Telephone Company having acquired the rights of the Western Telephone Company, the city of Keokuk on November 6, 1893, passed an ordinance granting a 10-year franchise to the Central Union Company, which ordinance also specified the manner in which the streets were to be used. This ordinance was accepted by the Central Union Company. In August, 1896, the Central Union Telephone Company sold to the Iowa Telephone Company all its property rights in the city of Keokuk, including the privileges granted by the ordinance. July 6, 1903, the city of Keokuk passed an ordinance requiring that all telephone companies should, as to certain territory, place the wires underground, and prescribing numerous other conditions to be observed, which ordinance was duly accepted by complainant.

Upon the foregoing ordinances, and the acceptance thereof by the complainant and its grantors, the city of Keokuk claims that, regardless of whether it did in fact have the power to require a franchise, the complainant is estopped to deny the power of the city, and that it is estopped from claiming rights under the state law. The city, when the first two ordinances were passed, having no power to grant a franchise, the attempt to exercise this power was futile, and any attempted grant by virtue of such ordinances was void. If the city

had no power to make the grant, the acceptance could not affect the rights of either party, so far as the franchise or right to use the streets, are concerned. These ordinances were not, however, entirely void; they were void only as they attempted to grant something the city did not possess. They were valid in so far as, under the general powers conferred, they fixed certain conditions upon which the right to use the streets could be exercised. Therefore it was entirely proper that the company should accept them, and such acceptance would be binding as to conditions prescribed, but would not be a waiver of rights acquired under the state legislation. So that, as to the ordinances of 1882 and 1893, they have no effect whatsoever in determining the question as to the rights of the complainant to use the streets of the city of Keokuk.

[15] The ordinance of 1903 did not purport to grant a franchise. The city at that time had the express power to regulate and prescribe conditions under which the streets should be used, and the acceptance of the ordinance by complainant can have no effect except in relation to such regulations and conditions.

[16] 10. In 1910 the city of Keokuk adopted a commission plan of government and the laws applicable thereto. The claim is made that under the powers thus acquired the ordinance adopted August 2, 1913, in response to a petition signed by the electors, is valid. Again we look to the powers conferred upon cities. Counsel point to the language:

"Any proposed ordinance may be submitted to the council by petition signed by electors of the city."

But the words "any proposed ordinance" must be construed with reference to the limited power of the municipality. There is no intention upon the part of the Legislature by this language to expand the powers specifically granted to cities, or those other powers incident to the express powers granted. Holding, as I do, that the Legislature would have no power by direct legislation to revoke the rights acquired by complainant under authority previously granted by the state, I cannot hold that it can be indirectly done by conferring upon a municipality the power which the Legislature itself does not possess. When the city of Keokuk became a commission governed city, it had the power, conferred in the Code of 1897, to "grant individuals or private corporations authority to erect telephone systems"; but it had no power to deprive the complainant of its rights acquired under previous legislation, and the Legislature did not, in providing for the commission plan of government, confer any such power.

The foregoing disposes of the case so far as the rights of the complainant to use the streets of the city of Keokuk are concerned. Other suggestions of counsel relating to powers or proceedings of the city council it is not necessary to consider.

[17, 18] 11. Second. Did the city of Keokuk have the power to fix the maximum rates to be charged by complainant in said city?

The limited powers of municipal corporations with reference to public utilities have been heretofore fully considered. Nowhere in the legislation of Iowa has there been any express power granted to

cities to fix or regulate rates to be charged by telephone companies. Express power is granted to fix the rates for water, gas, heat, light, and power, water meters, gas meters, electric meters, etc.; but nowhere does the Legislature confer upon the city by express words any authority over the rates of telegraph or telephone lines. Code, § 775, provides:

"Cities and towns shall have the power to authorize and regulate telegraph, district telegraph, * * * telephone, street railway, and other electric wires, and the poles and other supports thereof, by general and uniform regulation."

Section 959, relating to special charter cities and cities under commission form of government, provides:

"Such cities shall have power to regulate telegraph, district telegraph, telephone, street car, electric light and power poles, subways and wires."

Nothing is said, however, about fixing the rates to be charged by telephone companies or telegraph companies. Therefore, if the city of Keokuk has any such power with reference to complainant, it is by virtue of the general powers conferred, authorizing enactments for the general welfare, or else it must be found in the authority to "regulate." But the fact that the Legislature specifically confers the powers to fix rates for water, gas, light, power, etc., and limits the city's power as to telephones to "regulation," clearly to my mind implies that it was not the intention of the Legislature to confer the rate-making power upon the city. The rate-making power rests somewhere, originally in the state, and still in the state unless it has parted with such power. It was as easy for the Legislature to use express words in conferring the rate-making power upon cities as to telephones as it was as to water, gas, and electricity, and when the express language is not used we have to assume that it was because it was not intended to grant the power.

There are reasons for withholding such power from municipalities, and retaining it in the state, at least so far as general telephone systems composed of long-distance lines and local exchanges are concerned. The limit in rate making, whether by state or municipality, is that they must be reasonable and shall not be confiscatory. Where a corporation, as the complainant, owns an extensive system, it would be difficult, if the rate-making power existed in each separate municipality to fix rates for the service within the city, to have such uniformity in rates prescribed by the different cities as would insure a reasonable rate to all users of the telephone system, especially for long-distance service.

This question has been before many different courts, and they have uniformly held that, unless the state expressly granted the power to the municipality to fix rates, it had no such power. In St. Louis v. Bell Telephone Co., 96 Mo. 623, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370, it is said:

"We shall take it for granted that the state has the power to fix and prescribe the maximum rate for telephone service. That this power could be delegated to municipal corporations is equally clear. * * * Conceding all this, we are at a loss to see what this power to regulate the use of the streets

has to do with the power to fix telephone charges. The power to regulate the charges for telephone service is neither included in nor incidental to the power to regulate the use of streets, and the ordinance cannot be upheld on any such ground."

The Supreme Court of Missouri, in its opinion, reviews fully the powers of cities, and presents numerous authorities in support of its conclusion that the state has not conferred upon the city of St. Louis any power to fix telephone rates. It further says in its opinion:

"If it has the power to do this, it may also fix the charges for telegraph services, and for all other designated services which are of a public character. We conclude that the city has no power to pass the ordinances in question by reason of any of the charter powers before considered."

To the same effect is State v. Missouri Telephone Co., 189 Mo. 197, 88 S. W. 41, 3 Ann. Cas. 1044; Mills v. City of Chicago (C. C.) 127 Fed. 731; City of Richmond v. Richmond Natural Gas Co., 168 Ind. 82, 79 N. E. 1031, 11 Ann. Cas. 746; In re Pryor, 55 Kan. 724, 41 Pac. 958, 29 L. R. A. 398, 49 Am. St. Rep. 280; Lewisville Natural Gas Co. v. State, 135 Ind. 49, 34 N. E. 702, 21 L. R. A. 734.

I consider this question only in so far as it applies to the case before the court, with reference to the rights of a corporation whose rights were acquired prior to the time that municipalities were empowered to grant authority to telephone companies to use the streets of the city. What rights the city may have in granting such authority under the present law is not decided.

The exceptions to the master's report are overruled. Respondent excepts. Counsel for complainant will prepare an enrolled decree and submit it to counsel for respondent, who will within five days present any objections they may have thereto.